No. 37,269

R. E. Evans, *Appellant,* v. J. A. Aylward and Aylward Production Company, *Appellees.*

(201 P. 2d 1044)

Opinion filed January 22, 1949.

*George Siefkin, George B. Powers, Samuel E. Bartlett, Andrew F. Schoeppel, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Thomas E. Woods,* and *Robert C. Foulston, Jr.,* all of Wichita, were on the briefs for the appellant.

*Howard T. Fleeson,* of Wichita, argued the cause and *Homer V. Gooing, Wayne Coulson, Paul R. Kitch, Dale M. Stucky* and *Donald R. Newkirk,* all of Wichita, were with him on the briefs for the appellees.

The opinion of the court was delivered by

SMITH, J.: This was an action to set aside a contract for settlement of a partnership. The trial court sustained defendant's demurrer to plaintiff's evidence. The plaintiff has appealed.

The two defendants are for all practical purposes one and the same and will be so treated in this opinion. The petition alleged that defendant Aylward in 1941 was a man of means and engaged in many enterprises in the oil business. The plaintiff had considerable experience in salvaging oil properties. He was without any considerable amount of funds. In 1941 they entered into a series of agreements by which plaintiff would find oil properties which could be purchased for a salvage value or less and Aylward would advance the money to purchase the property and to carry on the work of salvaging it and plaintiff would not draw any salary but would be paid his expenses and upon completion of the operation

Aylward would be first entitled to the money he advanced, including expenses incurred by plaintiff, and the profits, if any, would be equally divided between plaintiff and defendant. During 1941 and 1942 the foregoing practice was carried out as to five properties. In May, 1942, in connection with a project referred to as the Hauschild lease Aylward advanced the money to purchase pipe pulling machinery in the amount of $15,000. November 13, 1943, an agreement with reference specifically to this and one other project and the above mentioned machinery was entered into by the parties, which provided that plaintiff was to look after the equipment and draw an expense account but no salary until Aylward had received all money expended by him, after which plaintiff was to receive a one-half interest. The last provision in this agreement was that either party could discontinue the venture on ten days' notice to the other to buy or sell.

Then followed some allegations about the Hauschild and Douglas deals and that besides his expenses plaintiff was advanced $300 per month and Aylward drew from the partnership account money and property in the amount of $17,000; that following these deals the parties orally entered into and carried out some four other deals, for which Aylward advanced the money necessary in the purchase; that on January 1, 1945, these had been substantially closed with the exception of some surplus material, and there was a balance of money in the possession of Aylward in the amount of $10,000 and cash profits had been realized in the amount of $10,000; that plaintiff requested a division of the profits but such division was evaded and Aylward made advancements to plaintiff only in the amount sufficient to take care of his pressing financial needs; that in February, 1945, the parties acquired a project known as the Stuckey-Gratton deal, upon which there were some five producing wells; that the purchase price was $17,500, which Aylward advanced under the oral contract, to which reference has already been made; that the parties agreed they would attempt to put two of these wells in production and cause one of them to be drilled to a greater depth; that from that time until February 19, 1946, the plaintiff devoted his time to drilling this well deeper, that during the latter part of 1944 and a portion of 1945 and up to February, 1946, the plaintiff was ill and hospitalized and $300 monthly was not sufficient to pay his expenses; that a fiduciary relationship existed between the parties during the operation of the Stuckey-Gratton leases.

The petition then alleged that in the latter part of January, 1946, the defendant notified plaintiff that the relationship would immediately terminate; that he would advance no further money for the Stuckey-Gratton deal as long as plaintiff was connected with it and demanded that plaintiff sell his share of all of the deals for $5,000; that plaintiff requested defendant to continue with the arrangement but that defendant refused to do so and refused to make any division of the profits or any further advancements to the plaintiff; that defendant on account of plaintiff's illness and his being financially distressed used the power and means in his possession and particularly his control of the property and funds jointly owned by the parties and practiced business compulsion upon the plaintiff and was guilty of fraud, duress and undue influence in securing the partnership settlement from plaintiff, whereby defendant paid plaintiff $15,000 and a Studebaker automobile and plaintiff assigned to defendant all his interest in the other partnership property.

The petition set out two particulars of which this fraud and duress consisted—one that Aylward terminated the relationship and withheld any further monthly payments and refused to make any division of profits which had accrued—the other that he submitted to plaintiff statements purporting to show the financial condition of the partnership, which statements were misleading and untrue because they failed to show certain withdrawals of Aylward and failed to show that much of the profit to which plaintiff was entitled on other deals was used to apply on the Stuckey-Gratton deal. The petition then stated that the settlement was obtained without a consideration in that the amount paid to the plaintiff by defendant was less than he was entitled to; that an audit of the books would show the exact dates and amounts of Aylward's withdrawals; that subsequent to February 19, 1946, Aylward had conveyed the portions of the Stuckey-Gratton leases to the Aylward Production Company.

In general the prayer asked that the partnership settlement be set aside and an accounting be ordered between the parties. After some motions directed at the petition had been ruled on the defendants filed an answer, which was first a general denial and then a specific denial, that by the terms of the agreement there was to be a division of the profits on each salvage project on its completion but alleged it was the understanding there should be no settlement until all

projects had been handled and in the meantime the plaintiff was permitted to draw against his share for his reasonable living expenses; that the agreement of November 13, 1943, superseded all oral agreements and the parties operated under it until February 19, 1946; that the parties undertook to deepen one of the wells on the Stuckey-Gratton lease and expended on it $40,241.90, which was more than its fair market value; that in January, 1946, Aylward orally informed the plaintiff that he had become dissatisfied with plaintiff's conduct of the joint operation and demanded that plaintiff sell his interest or buy defendant's interest and at that time Aylward offered to sell plaintiff his interest for $10,000; that from the first of February, 1946, until the 19th of February, the parties negotiated and finally entered into the partnership settlement to set aside, which this action was brought.

The answer further denied there was any misrepresentation or concealment by Aylward of any fact or that he practiced any fraud or oppression or exerted any undue influence or compulsion upon the plaintiff. The sole witness for plaintiff was himself. At the close of his testimony defendant demurred to it and the demurrer was sustained—hence this appeal.

The business entered into by the parties was that of salvaging oil field equipment. The plaintiff who had considerable experience in oil field matters would find a lease where about all the oil had been pumped out. He would buy this lease at what he deemed a price that would permit it to be salvaged at a profit. He would then proceed to pull the pipe out of the well and to take up the other equipment. The partners would then sell this equipment at the best price obtainable.

A successful carrying on of such an enterprise required a man who could accurately estimate the amount of salvage a lease would be apt to yield, who understood how to pull the pipe and to dismantle the lease of the other equipment, and who had good judgment as to the price material should bring and when and in what manner it could be sold to the best advantage. All these qualities plaintiff supplied for the partnership. Another element was needed —there must be money. Aylward had that and furnished it. The first joint venture was successful and a profit of $6,000 was divided between the partners. Plaintiff testified that some four other projects were successfully carried to a final conclusion and the profits divided. In handling these enterprises there was no written contract

between them. Finally on November 13, 1943, a writing was entered into by the parties. It was in the form of a letter written by Aylward to Evans. It read as follows:

"This is to confirm our verbal agreement when I purchased the L. E. Douglas properties known as the Hauschild lease described as the Northwest Quarter (NW ¼) of Section 15-21S-7W, and the Engelland lease described as the East Half of the Southwest Quarter (E ½ SW ¼) of Section 15-21S-7W, both in Rice County, Kansas, and one pipe pulling machine purchased from C. L. Steinberg & Co., and one pipe pulling machine purchased from R. S. Tomar, and one Studebaker automobile purchased from Automobile Brokers, Inc., in the total amount of $50,471.26.

"It is understood and agreed that you are to look after this equipment and draw an expense account to be mutually agreed upon, but draw no salary until I have received all moneys expended by me towards these ventures, then you are to receive one-half interest in whatever equipment and profit that has accumulated.

"Any time that either party decided to discontinue this venture, he is to give the other party ten days notice to buy or sell whatever equipment is left.

"If this is your understanding of our agreement, Kindly indicate your acceptance by signing in the space provided below."

It will be noted the agreement referred to two leases, two pipe pulling machines and an automobile for which Aylward had paid $50,471.26, and provided that plaintiff was to look after the equipment, draw an expense account and no salary and after defendant had received the amount of his investment plaintiff was to receive one-half interest in whatever equipment and profit had accumulated. It will be noted it was provided that either party might discontinue the venture on ten days' notice to the other party. In the beginning plaintiff drew only his expenses. Later he had a drawing account of $300 a month. There is no dispute about the above facts.

At the outset it should be noted that while the action was brought to set aside the release and for an accounting the plaintiff must first set aside the release before he is entitled to an accounting. (See *Smith v. Webb,* 142 Kan. 230, 46 P. 2d. 618; *Frazier v. Railway Co.,* 97 Kan. 285, 154 Pac. 1022.)

Appellant first argues that there was a fiduciary relationship between the parties and that where there is such a relationship and there is a misrepresentation, concealment or undue influence the courts of equity will declare the transaction void and restore the parties to their original rights. There can be no doubt about that being the rule. But were they fiduciaries? One circumstance that mitigates against such a conclusion is that Aylward told Evans on

February 18, 1946, he wished to discontinue the partnership. There was considerable bargaining during that day and the release was not executed until the next day. In the meantime, Evans had succeeded in causing Aylward to increase the amount he would pay from the figure of $5,000 first offered to the $15,000 and the car finally agreed on. Be that as it may, the burden of proving fraud or misrepresentation or one of the other grounds alleged was on the plaintiff.

The first allegation of misconduct on the part of Aylward was that plaintiff requested division of the profits from the various enterprises entered into from the time of the signing of the partnership agreement until buying the Stuckey-Gratton and Aylward refused to make such division stating "the books had not been brought up to date." Plaintiff testified to about that effect. On consideration of a demurrer to the evidence we must consider that allegation as proved. Even so, it is no more than an establishment that plaintiff at that time had a cause of action against defendants for an accounting and for dissolution of the partnership. It affords no ground for setting aside the release. All these requests for a division of the profits had been made and refused long before the release was executed.

The next ground pleaded by plaintiff to set aside this release is that defendant in violation of his contract refused to continue the oral agreement, refused to make division of the profits or any further advancements to plaintiff and insisted that plaintiff execute to him an assignment of all interest in the property owned by the partners. Plaintiff testified to these facts and for the purposes of this record they must be taken as true. They amount to nothing more, however, than a statement that defendant had decided to take advantage of the clause in the written contract to discontinue the relationship at ten days' notice. Naturally if he decided to discontinue the partnership he would cease paying plaintiff the $300 a month from his own assets. What plaintiff would draw from the partnership assets would be a matter of an accounting between the parties unless, as done here, they agreed on a settlement. To hold otherwise would be to hold that once a party had entered into an arrangement of this kind he could never withdraw from it. Such is not the law regardless of the ten-day clause. (See *Blaker v. Sands*, 29 Kan. 551; *Koenig v. Adams*, 37 Kan. 52; 14 Pac. 439, also 40 Am. Jur. 298.)

Plaintiff next alleged that Aylward knew he had been ill, was financially distressed, had no property or income other than the profits from the partnership, no means to meet his distressing obli-

gations and the fact that he controlled the partnership and practiced business compulsion upon the plaintiff and was guilty of fraud, duress, and undue influence in securing the release. These are general allegations but are particularized in subparagraphs, as follows:

"(a) That the defendant without cause and notice terminated the relationship between the parties and withheld from the plaintiff any further monthly payments and refused to make any division of the profits or property which had accrued to the parties on account of said transactions."

This allegation has already been considered here. The argument on it is but little more than an argument that defendant was obliged to remain in the partnership indefinitely. No reason appears in the pleadings or testimony of plaintiff why he did not raise the question of defendant's right to do this in a proper action before he executed the release. He was at the time he executed the release in possession of all the facts testified to by him on this point.

And (b) the next statement as to details of the fraud practiced by defendant are that he submitted statements of accounts that he knew were false and misleading because they failed (1) to account for many items of equipment salvaged but not yet disposed of; (2) failed to assign a fair and reasonable value to properties listed; (3) failed to take into account certain withdrawals of Aylward; (4) failed to reflect the correct amount of plaintiff's interest in the properties and his profits; (5) failed to show that a considerable amount of plaintiff's profits were wrongfully used in the purchase of the Stuckey-Gratton lease; and (6) were false and misleading in particulars which an audit would disclose.

The burden was on the plaintiff to prove these allegations and that he relied on the truth of the statements in executing the release. (See *Grentner v. Fehrenschield,* 64 Kan. 764, 68 Pac. 619; *Smith v. Webb,* supra; 26 C. J. 1141; also *Petroleum Co. v. Craig,* 112 Kan. 528, 212 Pac. 117.) The first is the allegation that the statement furnished plaintiff failed to take into account the many items of salvaged material undisposed of from the various enterprises. To prove this allegation plaintiff testified to such a situation in almost so many words. There can be no doubt but that there was unsold material left over from every one of the deals. There is no evidence at all, however, that plaintiff did not know about such material being left undisposed of. In fact, his testimony is to the effect that he more than Aylward knew of this material and about the amount of it. He was the field man in actual charge of the dismantling of the

leases and the selling of equipment. Furthermore, the release referred especially to "equipment on hand."

It is a little difficult to deal with the charge that the statement failed to assign a fair and reasonable value to the properties listed in the statement. Plaintiff testified that the partners had closed up all the deals except the Trustee lease when they bought the Stuckey-Gratton lease. He testified that the profit from the Trustee deal was $23,000 with some salvage left over. As to the Stuckey-Gratton deal, he testified as to what was paid for it. The statement showed how much had been spent on it. No one was able to say how much would be realized from it. He testified that Aylward, when they were bargaining about the release, said he would take a loss on it. Plaintiff at that time stated they should be able to salvage it even then at a profit. Plaintiff had his opinion as to what would be the outcome and Aylward had his. There is no testimony that defendant knew any more about the value of it than plaintiff knew. There is no evidence that plaintiff relied on Aylward.

Plaintiff next charged that Aylward drew out $2,000 more from the partnership account than he said he did in the statement. To prove this plaintiff testified that Aylward had actually drawn $15,000 from the joint bank account when actually he had drawn $17,000. We do not find any figure of either $15,000 or $17,000 on the statement. Presumably this refers to Aylward's expenditures for equipment. He was entitled to draw out his actual expenditures according to the theory of all parties. There is no testimony of plaintiff as to what this expenditure actually was. Furthermore, plaintiff does not say whether he learned about this withdrawal before or after the executing of the release.

Plaintiff next charged that the statement failed to take into account the correct amount of his profits from the operations of the partnership. To prove this he testified as to the profit on each deal. He had this information before he executed the release and cannot now advance as a reason for setting aside the release that he relied on a statement that placed his interest at some other figure.

The next charge is that the release should be set aside because the statement failed to take into account the fact that a considerable portion of his profits on previous ventures had been used in the purchase of the Stuckey-Gratton lease.

Plaintiff argues that he was entitled to his share of these profits regardless of whether the Stuckey-Gratton lease was carried out to

a profitable conclusion. The argument is really that when the partners started work on the Stuckey-Gratton lease Aylward should have advanced the cash necessary to carry that on from his own funds rather than from the accumulated profits from the other enterprises. Plaintiff testified that the written contract was modified in that respect. The answer to that argument would require an examination and consideration of the partnership contract and the actual interpretation put upon it by the parties. It is not necessary for us to decide that question here, however. This is an action to set aside a contract of settlement. Before he executed the settlement agreement plaintiff knew Aylward had used the partnership funds to defray the expense of deepening the well on the Stuckey-Gratton lease.

He testified that they concluded to deepen one of the wells on the Stuckey-Gratton lease; that they had trouble and finally ended up with bailers, sand pumps and drilling tools in the hole; he was sick all this time and at the time they started deepening the well, according to the figures given him, his share in the partnership would be about twenty or twenty-five thousand dollars.

If he was dissatisfied with the conduct of Aylward in that regard he had adequate remedy by means of an action for an accounting then. He could not execute the release and then rely on conduct of Aylward about which he knew to set it aside at a later date.

Finally plaintiff's final argument may best be stated in his counsel's own words:

"The undisputed facts of the instant case show that at a time when the defendant well knew the financial stress, the economic necessity, and the physical condition of the plaintiff, he said, in substance, 'Unless you abandon our partnership and settle on the basis which I dictate, I will refuse to allow you to draw living expenses; I will refuse you your share of past profits, and I will further refuse to allow additional money to be invested in the salvage operation and thereby cause a loss in the salvage of the Grattan-Stuckey property.' Under such circumstances can this court, or any court, say that plaintiff did not enter into the settlement under duress? Could anyone contend that the parties to such a settlement stand on an equal footing? Could any one contend that this was the free and voluntary act of plaintiff? Under these circumstances we submit that there was not and could not have been any freedom of choice. There was but one avenue open to the plaintiff. Either he must submit to the settlement offered by the defendant or suffer financial ruin."

What constitutes duress or business compulsion must depend upon the circumstances of each particular case. (See *McCormick v. Dalton*, 53 Kan. 146, 35 Pac. 1113; and *Milling Co. v. Gas &*

*Electric Co.*, 115 Kan. 712, 225 Pac. 86.) In the McCormick case we said:

"Duress, in its more extensive sense, is that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind and will of a person of ordinary firmness." (p. 149.)

In the Milling Co. case the action was for overpayment of a bill for electric power. The Milling Company argued that it had contracted under duress to take power from the Power Company at an agreed rate. We said:

"We have traveled far from the common law duress of bodily imprisonment or fear of loss of life or member or of imprisonment to the modern doctrine of involuntary payment. There must be unlawful coercion; but we are no longer restricted to goose flesh producing agencies, and the mythical man of ordinary courage and firmness is no longer invoked as a standard. It is sufficient that the constraint, in the particular instance, destroy free agency to pay or not to pay according to one's own will, whether relief were formerly obtainable by common law action for duress, or by suit in equity for wrongful compulsion." (p. 715.)

We pointed out that the contract for the increased rate had to be signed by the Milling Company or run the risk of ruin on account of the mill closing during the busy season of grinding wheat immediately after harvest. On that question we said:

"If plaintiff flatly refused to meet what practically had taken the form of a demand, defendant might, in view of what had occurred, discontinue delivery of current on short notice, and no notice which might reasonably be expected could prevent disaster. The result is the 1918 payments were made under that constraint which fairly amounts to moral duress." (p. 715.)

It will be noted the contract was entered into under circumstances which required action at the moment to prevent ruin. Here we do not have any such situation. Plaintiff testified that for some months he had been dissatisfied with Aylward's failure to divide with him the profits of each deal as it was completed. He had then sufficient grounds according to his testimony to warrant him in bringing an action for an accounting. He knew from the outset that Stuckey-Gratton venture was costing more than the partners had anticipated. He knew the profit from the other deals was being used to carry it on. Had the deal been profitable this would have increased his profit because there would have been no repayment to Aylward of his capital investment. Knowing all these facts, he cannot be said to have been confronted with a sudden

emergency such as destroyed his will when he executed the release. In *Burger v. First Nat'l Bank,* 124 Kan. 23, 257 Pac. 979, we held:

"When parties to a transaction differ as to how it should be settled, one of them contending it should be settled on one basis, the other contending it should be settled on another basis and one proposes the settlement on the basis as he contends for and the proposition is accepted, it is in legal substance a settlement. The fact that the party accepting does so complainingly avails him nothing. The effective way for him to protest such settlement is to decline the offer of settlement." (Syl. ¶ 2.)

In *Kiler v. Wohletz,* 79 Kan. 716, 101 Pac. 474, we said:

"There was a substantial controversy between the parties and a compromise and settlement of that controversy. That being true, the court can not go behind the settlement to determine whether the original claim of McCann was just or whether Wohletz's version of the negotiations was right." (p. 719.)

We find nothing in the testimony of plaintiff as to his physical condition tending to prove that it was severe enough to deprive him of the ability to exercise his free will.

In *Carver v. Fraternal Citizens,* 103 Kan. 824, 176 Pac. 634, we approved the following instruction:

"Physical weakness or mental worry alone, are not sufficient to avoid a settlement . . . ; neither are financial distress nor threat or fear of litigation alone sufficient to avoid a release."

See, also, *Starks v. Field,* 198 Wash. 593, 89 P. 2d 513, where the court said:

"Contracts, sales, or compromises, made under stress of pecuniary necessity, are of daily occurrence, and if such urgency is to affect their validity, no one could safely negotiate with a party who finds himself in difficulty by virtue of financial adversities." (p. 599.)

See, also, *French v. Shoemaker,* 14 Wall. 314, 20 L. Ed. 852, where the court said:

"Enough appears in the record to convince the court that the respondent was in straitened circumstances, that his business affairs had become complicated, that he was greatly embarrassed with litigations, and that he was in pressing want of pecuniary means, but the court is wholly unable to see that the complainant is responsible for those circumstances or that he did any unlawful act to deprive the respondent of his property, or to create those necessities or embarrassments, or to compel him to do what he acknowledges he did do, which was to yield to the pressure of the circumstances surrounding him, and as a choice of evils accepted the advance of five thousand dollars and the shares assigned him in the new organization as proposed, and voluntarily signed both the agreement and the assignment. Such an act as that

of signing those instruments, under the circumstances disclosed in the record, must be regarded, both in equity and at law, as a voluntary act, as it was unattended by any act of violence, or threat of any kind, calculated in any degree to intimidate the party or to force the result, or to compel that consent which is the essence of every valid contract. Suppose he consented reluctantly, as he avers, still the fact is that he did consent when he might have refused to affix his signature to the instrument, as he had repeatedly done for the year preceding; and having consented to the arrangement and signed the instruments he is bound by their terms, and must abide the consequences of his own voluntary act, unless some of his other defenses set up in the answer have a better foundation." (p. 333.)

In *Riney v. Doll,* 116 Kan. 26, 225 Pac. 1059, we modified the definition of duress, which has already been quoted herein from *McCormick v. Dalton,* supra. We held in effect that a person of weak will was entitled to protection as well as one of strong will.

See, also, *Williamson v. Ackerman,* 77 Kan. 502, 94 Pac. 807, where we held that the test was whether the oppression exerted had the effect to overcome the will of the person at whom it was directed.

Here there is no evidence that plaintiff was a man of less than ordinary strength of will. He successfully bargained with defendant so that defendant increased his offer from $5,000 to $15,000 and the automobile. In the battle of wits the parties were about evenly matched. Summed up, all plaintiff's evidence established was that he preferred the immediate settlement on the terms made than the hazard of a lawsuit. Parties are confronted with that problem every day. We find nothing in this record to warrant the trial court in overruling defendant's demurrer to plaintiff's evidence.

The judgment of the trial court is affirmed.

PRICE, J., not participating.