No. 48,070

CAMPBELL-LEONARD REALTORS, *Appellee,* v. EL MATADOR APART-
MENT COMPANY, a Missouri Limited Partnership, PATRICK T.
HAYES, and C. FREDERICK BRAVE, *Appellants.*

(556 P. 2d 459)

Opinion filed November 6, 1976.

*Robert J. Campbell,* of Brown, Koralchik, Fingersh and Sildon, of Kansas City, Missouri, argued the cause, and *Ray L. Borth,* of Prairie Village, and *James F. Davis,* of Brown, Koralchik, Fingersh and Sildon, of Kansas City, Missouri, were with him on the brief for the appellants.

*Ronald L. Bodinson,* of Payne and Jones, Chartered, of Olathe, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: This is an action by a real estate broker for a commission for selling an apartment complex. The trial court gave

the plaintiff judgment on a theory of *quantum meruit*, and defendants have appealed. Since the property was sold to purchasers admittedly produced by the plaintiff broker, the primary issue is whether the broker has somehow forfeited its commission.

The apartments were owned by the defendant El Matador Apartment Company, a Missouri limited partnership. The defendant Patrick T. Hayes is a general and limited partner of El Matador, and is a resident of Johnson County, Kansas. The other general and limited partner is C. Frederick Brave, a resident of Louisiana, who was not served with process.

Hayes and Brave formed El Matador in December, 1972, to take title to the apartments. Their plan was to buy the complex, lease it to full occupancy, and then sell it. Hayes, the man on the scene in Kansas City, took charge of the partnership's operations. He was a Missouri licensed real estate broker, and a self-employed real estate investor and mortgage broker. His experience included putting together four limited partnerships (including this one) for investing in commercial real estate in Texas and Missouri. Brave, the other partner in El Matador, was an architect and developer in New Orleans. He took no active role in the management of the property or in the negotiations for its sale.

Beginning in March, 1973, Hayes attempted to sell the complex. His first efforts consisted merely of placing ads in the Kansas City Star and talking to prospects. As the year wore on his efforts intensified, and he listed the property with at least two brokers. In the fall of 1973 a contract of sale was signed with a potential purchaser, but the deal fell through for reasons not disclosed in the record.

In January, 1974, Hayes was approached by Bill Fitzsimmons, a salesman for the plaintiff corporation, Campbell-Leonard Realtors of Prairie Village. The result was a written listing agreement calling for a 6% commission on a sales price of $355,000. Hayes signed the letter agreement as "Seller."

Hayes testified that the $355,000 selling price in the written agreement was "unrealistic" and "inflated," as he had learned from his own efforts to sell at that figure in early 1973. What was important to Hayes was to secure an assumption of first and second mortgages totalling $272,000, to pay the broker's commission, and to realize net cash for himself and Brave. According to Hayes he told Fitzsimmons in January, when the listing agreement was signed,

that his net cash requirement was $55,000. According to Fitzsimmons, Hayes' figure was $35,000. (That is essentially the only disputed fact in the record, and is not regarded as material by the parties or the court.)

On this basis Fitzsimmons set out to sell the property. He advertised it and showed it to a number of prospects over the next two and a half months, devoting by his account more than 100 hours to promoting the property and negotiating the sale. On March 21, 1974, he showed the property to the eventual buyers, Mr. and Mrs. Robert P. Schwermann.

On April 3, 1974, Fitzsimmons presented to Hayes an unsigned contract prepared by the Schwermanns' attorney calling for a purchase price of $340,000. Hayes interlineated some changes in the contract and then signed it as a general partner of El Matador Apartment Company. The contract was returned to the Schwermanns' attorney, who redrafted it, secured Mr. Schwermann's signature, and gave it back to Fitzsimmons for resubmission to Hayes.

On April 11, 1974, the revised contract was submitted to Hayes. He made two additional changes at that time and returned it to Fitzsimmons unsigned. At this meeting Hayes and Fitzsimmons discussed the broker's commission and at least tacitly agreed to a flat $15,000, rather than the 6% called for in the listing agreement. Hayes was unwilling to pay the full $15,000 in cash on closing, and there was an inconclusive discussion as to how much of it the broker should carry and on what terms.

On April 15, 1974, the contract with Hayes' latest amendments was signed by the Schwermanns and given to Fitzsimmons for resubmission to Hayes. This was done the same day. Hayes at that time signed the final version of the contract as a general partner. During the conversation he mentioned to Fitzsimmons that he had another prospective buyer interested in the property, and also that he would need to obtain Brave's signature on the contract.

Hayes signed the contract of April 15 in either three or four counterparts. Despite saying he needed Brave's signature he delivered at least two signed contracts to Fitzsimmons. Fitzsimmons testified there were at least three:

"Q. One for the Defendant Hayes, one for the Schwermanns, and one for yourself?

"A. Right."

Fitzsimmons thereupon delivered a signed copy to the purchasers. He testified:

"Q. Did Defendant Hayes understand your going to take this contract to the Schwermanns?

"A. Oh, yes."

Hayes did not deny this in his testimony, nor is there any claim that he instructed Fitzsimmons not to deliver the signed contract.

Between April 15 and April 24 Fitzsimmons made several attempts to meet with Hayes to settle the matter of the brokerage fee. An appointment on the 18th was broken by Hayes because of another appointment.

On April 24 Hayes informed Fitzsimmons that the Schwermann deal was off—that he had signed a contract to sell to another purchaser. Fitzsimmons relayed this information to the Schwermanns, who promptly recorded their contract.

The end result was that Hayes and his partner Brave, on the advice of counsel, decided to close the contract with the Schwermanns rather than litigate its validity. This they did on May 28, 1974, giving the Schwermanns a warranty deed signed by both Hayes and Brave. In return they received from the Schwermanns; an assumption of the first and second mortgages totalling $272,000; a note for $18,000 secured by a third mortgage; cash of $45,000; and an assignment of $5,000 earnest money previously paid by the Schwermanns and held in escrow by the broker.

When Hayes and Brave refused to pay the broker's commission this suit followed. At trial plaintiff relied on both express contract and *quantum meruit* theories. The trial court made findings of fact which included those recited above; it rejected plaintiff's express contract theory but found an implied contract to pay the reasonable value of the services rendered. This it fixed at $15,000, including the $5,000 held in the broker's escrow account, and rendered judgment accordingly.

The general rule of *quantum meruit* is set forth in *Brakensiek v. Shaffer*, 203 Kan. 817, 457 P. 2d 511:

"Where the minds of the parties did not meet as to some of the essential terms of a contract, a party thereto who furnishes material or renders services to the other party, relying on the terms as he understood them and thinking there was an express contract, is entitled to recover what the labor furnished was reasonably worth."

"Where parties agree for the performance of certain work, and the work is done and accepted, and it appears that there was a misunderstanding as to the price to be paid for it, the law rejects the understanding of each and awards reasonable compensation." (Syl. 1, 2.)

That was a case in which the seller agreed that the broker would be paid for his services if he obtained a buyer, but no agreement was ever reached as to the amount of the broker's fee. This court held that when a sale was completed to a buyer produced by the broker, the broker was entitled to the reasonable value of his services under a theory of *quantum meruit.* In the course of the opinion the court observed, "[w]here there is no evidence showing that the services were to be gratuitous the law implies a promise to pay for services performed by one person for another which are known to and accepted by the latter." (p. 821.)

In this case Hayes, on behalf of the partnership, engaged the services of the broker. There is no contention that he lacked authority to do so. The partnership, knowing of the broker's services, accepted them with Brave's full participation. There is no suggestion that those services were to be gratuitous—the trial court even found an agreement as to the amount of compensation, with only the time and terms of payment undetermined. *Brakensiek,* and the cases cited and discussed therein, would appear to be applicable here a fortiori.

Specifically, the long accepted rule with respect to commissions for real estate brokers was recently restated in *Winkelman v. Allen,* 214 Kan. 22, 519 P. 2d 1377, Syl. 1:

"The general rule is that a real estate agent or broker is entitled to a commission if (a) he produces a buyer who is able, ready and willing to purchase upon the proffered terms or upon terms acceptable to the principal; (b) he is the efficient and procuring cause of a consummated deal. The latter is subject to a qualification where failure in completion of the contract, or closing title, results from the wrongful act or interference of the principal."

In this case, of course, there was no "failure in completion of the contract"—the Schwermann contract was closed—so the qualification referred to above has no applicability. The broker produced a buyer who was ready, willing and able to purchase on terms which were ultimately acceptable to the seller, and it was the efficient and procuring cause of a consummated deal. Under the criteria of *Winkleman* the broker was entitled to a commission; under the rule of *Brakensiek* the amount of the commission was the reasonable value of the services rendered. Such was the judgment of the trial court.

On what theory, then, do defendants claim that no commission was due? They argue first that they received no "benefits" from plaintiff's labors for which they should be compelled to pay in the

absence of an express agreement. (The trial court, it will be recalled, rejected the express agreement theory.) The argument is based on the fact that the contract they signed on April 24 with Hayes' other prospect would have netted them $20,000 more in cash, in lieu of the $18,000 note and third mortgage they received under the Schwermann contract. They contend that because they would have preferred the other deal, which was economically more advantageous to them, this one conferred no benefits upon them.

We cannot accept this proposition. Granting that $20,000 cash in hand is worth more than $18,000 payable over a period of years, the fact remains that defendants received gross consideration through plaintiff's efforts of $340,000. It strains all sense of semantics to say that this was of no "benefit" to them. The benefits they chose to accept were tangible and substantial; that they might have received more elsewhere cannot change that fact.

Their second argument against a *quantum meruit* recovery is that they didn't accept the benefits of the bargain "voluntarily," but did so only under "duress." The trial court, however, specifically found that plaintiff made no effort to enforce the Schwermann contract, and exercised no duress over defendants to close that contract. Defendants point to no evidence to the contrary, but say that they closed under duress caused by the recording of the Schwerman contract. This could not have occurred, they say, had Fitzsimmons not breached his duty to them by delivering the executed contract to the Schwermanns.

Hayes, however, returned the executed contract to Fitzsimmons with no instructions. He didn't tell him *not* to deliver it, and Fitzsimmons understood that he was *to* deliver it. Had Hayes wished to withhold delivery pending Brave's approval, it would have been a simple matter for him to retain all copies of the contract until Brave signed, or at least give instructions to Fitzsimmons. He did neither. The trial court found no breach of duty, and we do not believe a finding of breach is compelled by the evidence. (The same analysis disposes of defendants' "unclean hands" argument. There is no showing here of any willful misconduct, as called for under that defense. See *Green v. Higgins*, 217 Kan. 217, 535 P. 2d 446.)

More importantly, we are unable to ascertain in this case any element of "duress" as it has been generally recognized by this court. The only duress claimed arose from the simple fact that

the Schwermanns recorded their contract. By doing so they made public their claim to an interest in the property. Whether they in addition threatened to sue for specific performance we do not know and do not care. "It is not duress for one to threaten to take such legal proceedings as the law affords to recover damages for claimed injuries." (*Riney v. Doll*, 116 Kan. 26, 225 Pac. 1059, Syl. 2.)

The fact remains that defendants, on the advice of counsel, decided to close the contract by deeding the property and receiving the consideration provided for therein. That they decided to do so rather than litigate the validity of the contract is of no moment— it was still the exercise of a free choice.

We have recognized that "[w]hat constitutes duress or business compulsion must depend upon the circumstances of each particular case." (*Evans v. Aylward*, 166 Kan. 306, 314, 201 P. 2d 1044.) That was a suit to set aside a release given by one partner to another, and for an accounting. The plaintiff claimed the release was involuntarily given under duress because it was demanded when he was ill and in dire financial straits. This court first observed that plaintiff's illness was not such as to deprive him of the ability to exercise his free will. As to the alleged financial distress, the court quoted *Starks v. Field*, 198 Wash. 593, 599, 89 P. 2d 513:

"Contracts, sales, or compromises, made under stress of pecuniary necessity, are of daily occurrence, and if such urgency is to affect their validity, no one could safely negotiate with a party who finds himself in difficulty by virtue of financial adversities."

We concluded:

". . . Summed up, all plaintiff's evidence established was that he preferred the immediate settlement on the terms made than the hazard of a lawsuit. Parties are confronted with that problem every day." (166 Kan. at 317.)

Likewise here, there was no compulsion on the defendants to close the Schwermann contract beyond their business judgment that it was the most advantageous course of action available to them. In the eyes of the law it was a voluntary act. That being so, their acceptance of the benefits of plaintiff's services was voluntary, and the trial court properly found they should pay the reasonable value of those services.

What has been said largely disposes of this appeal. Defendants, however, devote a considerable portion of their brief to the proposition that the sale of the partnership's chief asset was not in the ordinary course of business, and that the trial court erred in finding

it was. The argument goes to whether Hayes, acting alone, had authority to bind the partnership to the Schwermann contract. It would be a pertinent field of inquiry if Brave had repudiated the contract and plaintiff had then sued on the theory that it had produced a buyer on terms agreeable to the seller. It is not relevant here because, regardless of Hayes' initial authority, Brave participated in the deed and thereby ratified Hayes' actions. *Cf. Bank v. Schulman,* 89 Kan. 182, 131 Pac. 559; *Corbett v. Cannon,* 57 Kan. 127, 45 Pac. 80. Once the contract was consummated the commission was earned, regardless of the contract's validity while it was still executory.

Finally, plaintiff has cross-appealed from the trial court's finding that there was no express contract for a $15,000 fee as a result of an oral modification of the written listing agreement. It contends that the time and method of payment was a mere detail which could be supplied by the court under the rule of reason.

The only purpose of the cross-appeal is to secure prejudgment interest from the date of closing, and that purpose points up the difficulty in plaintiff's position. Prejudgment interest is payable on money "due." (K. S. A. 16-201.) The missing element in the commission contract was an agreement as to when and how the commission was to be paid—*i. e.,* when it would be "due." Hayes was unwilling to pay the full amount in cash, so there was talk of $10,000 in cash and a note for the balance, and even talk of an assignment of the $18,000 third mortgage. Fitzsimmons himself testified that the matter of financing the commission was one he was not fully authorized to settle for his employer (the plaintiff). Two appointments were made but not kept to resolve this one question.

The missing element, then, was one to which both parties obviously attached a good deal of importance; it was more than a mere detail to be supplied by the court. We agree with the trial court that there was an essential element on which there was no meeting of the minds, and therefore no express contract. Hence, prejudgment interest was properly disallowed.

The judgment is affirmed.

APPROVED BY THE COURT.