Perry COMEAU, CRNA, individually and d/b/a Professional Anesthesia Management, Plaintiff,

v.

MT. CARMEL MEDICAL CENTER, INC., Defendant.

Civ. A. No. 93–2421–JWL.

United States District Court, D. Kansas.

Nov. 4, 1994.

---

Kevin L. Diehl, Eugene B. Ralston & Assoc., P.A., Topeka, KS, for plaintiff.

Jeffery A. Jordan, Darrell L. Warta, Foulston & Siefkin, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

### I. Introduction

Plaintiff Perry Comeau, doing business as Professional Anesthesia Management, now a Missouri resident, brought this action for breach of an employment contract with defendant Mt. Carmel Medical Center Inc., a Kansas corporation. Plaintiff alleges the employment contract was created through oral and written promises made by defendant which plaintiff relied upon to his detriment.[1] This matter is currently before the court on defendant's motion for summary judgment (Doc. # 23). Defendant argues that the contract which plaintiff alleges was breached was superseded by a written substitute contract, thus eliminating any causes of action plaintiff may have had as to the original contract. In response, the plaintiff argues that the second, substitute contract is voidable because it was signed under duress. Defendant attacks the plaintiff's duress contention as being insufficient as a matter of law. Because, for the reasons set forth below, the court agrees with the defendant, it grants the defendant's motion for summary judgment.[2]

---

1. In Count III of his original complaint, plaintiff asserted a fraud claim. The fraud claim was subsequently abandoned by plaintiff in his response to defendant's motion for summary judgment. Accordingly, the court grants summary judgment in favor of defendant on plaintiff's fraud claim.

2. The arguments of the parties which the court addresses here are the only ones which they have advanced. The court has not attempted to consider alternative theories which might have been advanced but were not.

## II. Facts

Plaintiff is a certified registered nurse anesthetist. His initial contact with defendant was through supplying CRNA's to defendant through his company, Professional Medical Placement. As time went on, the defendant asked plaintiff to do a complete study of the defendant's anesthesiology department to determine if the department would produce enough revenue to support an anesthesiologist and three nurse anesthetists. Following plaintiff's completion of the study, defendant determined plaintiff had some managerial skills and began discussions with plaintiff about managing its anesthesia services.

Plaintiff informed defendant that he wanted to manage the department in terms of supplying personnel, making suggestions and obtaining equipment. Plaintiff felt that he could do this through his Professional Medical Placement business out of Kansas City. Dan Lingor, defendant's president and CEO, informed plaintiff that defendant desired plaintiff to be involved with the facility full-time. Plaintiff told Mr. Lingor that he could make a full-time commitment to defendant in terms of closing down his Kansas City business and moving to Pittsburg, Kansas if defendant would put in writing that it was committed to making plaintiff manager of the department with an exclusive contract for three years.

On July 27, 1990, plaintiff and Mr. Lingor executed letters of intent and exchanged proposed drafts of a contract whereby plaintiff would move from Kansas City to Pittsburg to provide delivery of anesthesia services on a full-time basis. Both plaintiff and defendant were represented by counsel during the negotiations leading up to the letters of intent being executed. The draft contracts and letters of intent exchanged by the parties evidenced their intent that plaintiff's company, Professional Anesthesia Management ("PAM"), would be given exclusive control of operating anesthesia services at the hospital and that plaintiff would be employed for a period of three years. The letters of intent also noted that additional time was required for thoughtful examination of the contractual arrangements and implementation approaches that would cause the least disruption in ongoing anesthesia services at the hospital, but that it was the parties' intent to enter into a relationship along the lines of the proposed contract and to negotiate in good faith to finalize a written contract to that end.

Based on the representations contained in the draft contract and letters of intent, plaintiff moved his family from Kansas City to Pittsburg in August of 1990 and began delivering anesthesia services on a full-time basis for defendant. While negotiations continued, defendant established a home in Pittsburg and worked for defendant.

In the fall of 1990, Mr. Lingor discussed with defendant's Board of Trustees his recommendation that plaintiff's anesthesiology company be given the exclusive right to manage and direct the delivery of anesthesia services at the hospital. Certain members of defendant's medical staff were opposed to closing the anesthesiology department to Dr. Malcolm Freeman, who was then and had been the only anesthesiologist practicing at the hospital since 1980, nor did they want the anesthesiology department managed by someone who was not a medical doctor. Following this meeting, it was still Mr. Lingor's desire to enter into a formal exclusive arrangement with plaintiff. However, it subsequently became apparent to Mr. Lingor that such an arrangement would not satisfy the medical staff. By early 1991, defendant began to look for another anesthesiologist to exclusively manage and direct its anesthesiology department. Plaintiff was aware of these developments.

On June 27, 1991, plaintiff's lawyers, the firm of Payne & Jones, wrote defendant a letter making demand for defendant to issue a formal written contract consistent with the terms of the July 27, 1990 letters of intent. When such a formal contract was not forthcoming, plaintiff directly engaged in negotiations with the defendant's administration. The impetus for these negotiations was plaintiff's financial obligations on his Pittsburg home.

On November 1, 1991, a written contract was presented to plaintiff by defendant in

Mr. Lingor's office. Mr. Lingor advised plaintiff that if he did not endorse a contract at that time that it would be taken off the table. Plaintiff was informed that everything in the contract was entirely non-negotiable, that he could not take the contract from the office, and that he could not show the contract to a lawyer. Mr. Lingor further informed plaintiff that an exclusive contract would be signed with an anesthesiologist in a very short period of time and that plaintiff would have to take his chances with that anesthesiologist if he did not sign the offered contract. The contract was basically an employment contract which did not give plaintiff any control over the anesthesia services at the hospital. The contract provided for a term of employment of eighteen months, commencing November 1, 1991 and continuing to April 30, 1993. The pay plaintiff was to receive under the contract was reduced from the amount that had been contemplated in the original draft contracts, where plaintiff was to have exclusive control of the department. Plaintiff signed the contract offered at the meeting without consulting an attorney. Both parties thereafter performed their responsibilities under the written contract. Upon expiration of the written contract, plaintiff brought this action for breach of what he contends was the earlier agreement.

At the time the November 1, 1991 written contract was signed, plaintiff contends he was under personal and financial pressures. He had purchased a house in Pittsburg, Kansas under terms which required that he soon pay a substantial additional cash payment. Moreover, plaintiff believed he could not easily sell the house during the upcoming winter for an amount sufficient to recoup his costs. Finally, plaintiff's son suffered from a disability which made it difficult for him to be moved often between schools.

### III. Standard for Summary Judgment

■ When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Langley v. Adams County, Colorado,* 987 F.2d 1473, 1476 (10th Cir.1993). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anthony v. United States,* 987 F.2d 670, 672 (10th Cir.1993). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

■ Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R. Co.,* 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

### IV. Summary Judgment on Plaintiff's Breach of Contract Claim

#### A. Substituted Contract

■ The existence of a substituted contract is a question of law for the court in cases in which a written agreement is involved. *Barbara Oil Co. v. Kansas Gas Supply Corp.,* 250 Kan. 438, 454, 827 P.2d 24 (1992).[3] Invocation of the substituted contract defense requires a showing of the following elements: (1) a previous valid contract; (2) agreement on a new contract; (3) validity of that new contract; and (4) intent to extinguish the old contract and substitute the new. *Id.; Elliott v. Whitney,* 215 Kan. 256, 259–60, 524 P.2d 699 (1974). Each of

---

3. The parties do not dispute the applicability of Kansas law to this diversity case.

these elements must be satisfied in order to establish a substituted contract.[4]

■ The existence of a previous valid contract is not disputed by the parties. Plaintiff alleges that a previous valid contract was created by promissory or equitable estoppel. Promissory estoppel is a doctrine by which courts view performance in reasonable reliance on a promise as sufficient to create a legally binding contract where a contract otherwise lacks consideration. *See* Restatement (Second) of Contracts § 90 (1979); *Kirkpatrick v. Seneca National Bank*, 213 Kan. 61, 515 P.2d 781 (1973). Plaintiff contends that his actions in selling his business in Kansas City, moving his family to Pittsburg and purchasing a home there, and commencing work at the hospital, all taken in reliance on defendant's promise to tender him a contract providing him with all managerial and supervisory responsibility over the hospital's anesthesiology services, operated to create a binding contract. Defendant does not contest this argument. Therefore, for purposes of this summary judgment motion, the court accepts plaintiff's promissory estoppel claim as having created a binding legal contract.[5]

Aside from the duress claim, which is addressed separately, there is also no disagreement concerning the creation or validity of the new contract. Thus the second and third elements are satisfied.

■ The fourth and final element is the intent of the parties to extinguish the old contract and create a new one. In *Security Ben. Life Ins. Co. v. F.D.I.C.*, 804 F.Supp. 217, 228 (D.Kan.1992), the court indicated that if the intention of the parties is expressed in writing, intention is a question of law for the court to decide. Defendant argues, without disagreement by the plaintiff,

that the express language of the November 1, 1991 written contract sets out the intent to extinguish any former contract created by reliance and the intent to create a new one. Paragraph 13 of the written contract states:

> 13. *Entire Contract and Agreement.* It is specifically agreed by the parties that all previous communications, negotiations and representations, either verbal or written, between CRNA and MEDICAL CENTER are consolidated into this written Agreement. There have been no oral representations, warranties, promises, covenants or undertakings by and between any of the parties hereto pertaining to the subject matter of this Agreement except as reduced to writing herein. This Contract contains the entire agreement and understanding between the parties, supersedes all prior negotiations or agreements and may be amended only in writing by an amendment or supplemental agreement attached to and executed by the parties.

The court agrees that this clause expresses the intent of the parties to substitute the written contract for any previously existing contract created by plaintiff's reliance on any representations made by the defendant. It is a comprehensive merger clause that leaves nothing for debate.

■ Plaintiff implicitly argues that his claims of promissory and equitable estoppel continue regardless of the existence of a subsequent, valid, written contract. He provides no authority to support such a conclusion, however. Contracts based on reliance enjoy no superior status to those formed by conventional means of offer and acceptance and based on valid consideration. Therefore,

---

4. Kansas Courts in deciding substituted contract questions have often referred to such contracts as novations. The Restatement distinguishes a substituted contract from a novation in that a novation involves the substitution of a new party, whereas a substituted contract does not. Restatement (Second) of Contracts § 279 (1979). In all other aspects the doctrines are identical.

5. In addition, plaintiff alleges rights arising from a claim of equitable estoppel. Plaintiff argues that defendant's factual representations as to an exclusive managerial contract estop the defen-

dants from denying its existence. Equitable estoppel has the effect of preventing a party from asserting rights inconsistent with prior representations. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 855 P.2d 929 (1993). Stated differently, the doctrine of equitable estoppel creates no new rights. Instead, the purpose of equitable estoppel is to preserve rights already acquired. Therefore, plaintiff's allegations of equitable estoppel at most prevent the denial of the inclusion of certain terms in the contract created by promissory estoppel.

a contract by estoppel may be replaced like any other contract between the parties.[6]

### B. Duress

■ Plaintiff's argument against defendant's substituted contract defense is that the November 1, 1991 written contract was signed under duress and should not be enforced against him. In essence, a contract signed under duress is voidable because there is no actual mental agreement (assent) between the parties. The elements constituting duress by threats in Kansas are as follows:

> To constitute duress by threats the actor's manifestation must be made for the purpose of coercing the other; must have for its object the securing of undue advantage with respect to the other; must be of such a character that it is adapted to overpower the will of the other and is reasonably adequate for the purpose; must in fact deprive the other of free exercise of will; and must cause the other to act to his detriment.

*Hastain v. Greenbaum*, 205 Kan. 475, 482, 470 P.2d 741 (1970).

■ Whether alleged facts pleaded as constituting duress exist, if the existence of those facts is denied, is a question for the jury. However, whether alleged facts are sufficient to constitute duress is a matter of law. *Id.; White v. General Motors Corp., Inc.*, 908 F.2d 669, 673 (10th Cir.1990).

Plaintiff's duress claim is based on the following paraphrased allegations of fact set forth in his response to defendant's summary judgment motion:

> (39) The November 1, 1991 contract would be taken off the table if not endorsed at that time. The contract could not be taken to a lawyer because everything in the contract was totally nonnegotiable.

(40) Plaintiff was told that an exclusive contract would be signed with an anesthesiologist soon and, without the protection of the November 1, 1991 contract, plaintiff would have to take his chances with a new anesthesiologist. .

(41) Plaintiff would soon have to pay another 10% down on his house, which amounted to $14,000.

(42) Plaintiff's house could not be sold easily in the wintertime in Pittsburg, Kansas, especially after having put over $20,000 into repairs.

(43) Plaintiff's son suffered from short term memory loss and required a stable environment in order to function well. In addition, plaintiff had completely disassembled his business in Kansas City and was facing financial pressures if he did not sign the contract.

In sum, plaintiff argues that the threat of no further negotiation of the contract was sufficient to overcome his free-will because he faced financial and personal pressures brought on by defendant inducing plaintiff to establish a home in Pittsburg, Kansas.

■ Kansas courts have not explicitly analyzed duress under the rubric of "economic duress" or "business compulsion." However, several Kansas cases, without going into much detail, have discussed economic considerations in connection with duress claims. *See Campbell Leonard Realtors v. El Matador Apt. Co.*, 220 Kan. 659, 556 P.2d 459 (1976); *Evans v. Aylward*, 166 Kan. 306, 201 P.2d 1044 (1949). Based on those cases, and following the reasoning of the Tenth Circuit Court of Appeals in *Applied Genetics Intern., Inc., v. First Affiliated Securities, Inc.*, 912 F.2d 1238 (10th Cir.1990), which construes Wyoming law, the court finds that Kansas law would recognize the concept of economic

---

**6.** Plaintiff's final point in his response to defendant's summary judgment motion is that even if a valid substituted contract exists, he should still be able to prove the amount of damages suffered for breach of the contract based on reliance up to the time that the written contract was entered into. However, a substituted contract operates to replace all previous claims, including a breach of contract claim. *See Elliott*, 215 Kan. at 259, 524 P.2d at 703. Restatement (Second) of Con-

tracts § 279 states that "the substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty". Clearly, if a breach of the second contract does not give the right to enforce the original contract, then a properly performed substituted contract does not give the right to enforce the original contract.

duress because it is merely a specific application of the general duress principle.

■■■ The elements of economic duress, as articulated by the Tenth Circuit as a general rule, are: (1) a wrongful act or improper threat; (2) the absence of a reasonable alternative to entering the agreement; and (3) the lack of free will. *Applied Genetics*, 912 F.2d at 1241. The only variant which an economic duress claim adds which is not explicit in the Kansas duress test is "the absence of a reasonable alternative to entering the agreement". However, this is essentially an objective form of the free-will prong of the well-accepted test and is consistent with the rule set out in Restatement (Second) of Contracts § 175. The determination of reasonable alternatives, then, is an objective inquiry into the range of possible alternatives, whether or not the plaintiff actually considered such alternatives, and it is the party asserting duress who must show why there was an absence of such alternatives in order to avoid a contract because of economic duress. *See Libel v. Libel*, 5 Kan. App.2d 367, 368, 616 P.2d 306 (1980) (generally one who asserts duress to avoid an agreement has the burden of proof to establish that claim and such evidence must be of a substantial nature).[7]

■■ Plaintiff has failed to present any evidence of a lack of reasonable alternatives. On the contrary, several apparently reasonable alternatives to signing the written contract existed in light of the fact that plaintiff has produced no evidence that he was in any immediate danger of losing his job if he failed to sign the written contract.[8] First, plaintiff admits he was given the choice of continuing work without a written contract as he had been doing for over a year, and working out an employment relationship with a future anesthesiologist when and if that person was hired. Second, plaintiff understood that, while the contract was offered as non-negotiable, he might have the opportunity to again negotiate with the hospital. Therefore, plaintiff could have continued his employment and his negotiations with the defendant as he had for over a year. Third, Plaintiff could have continued his employment and sought specific performance of the alleged contract by estoppel in a court of law, as he eventually did in this suit.

Courts have analyzed whether an alternative was reasonable, under the second prong of the economic duress test, by comparing the choice of conduct taken with alternative courses of conduct. *See, e.g., Blubaugh v. Turner*, 842 P.2d 1072 (Wyo.1992).[9] In *Blubaugh*, the court considered a summary judgment motion and found that a release of liability agreement was not signed under economic duress when the plaintiff would have given up $4,560.78 and outplacement counseling, plaintiff did not have the opportunity to negotiate the terms of his release, plaintiff was in shock and distraught, and plaintiff was not told that he had a right to consult with an attorney. *Id.* at 1075. In *Blubaugh* the Wyoming Supreme Court approved the trial court's summary judgement conclusion that plaintiff's reasonable alternative was to

7. The general rule in Kansas is that whether alleged facts are sufficient to constitute duress is a matter of law. *See Hastain v. Greenbaum*, 205 Kan. 475, 482, 470 P.2d 741 (1970). Consequently, this court believes that under Kansas law the question of whether the facts presented constitute an absence of a reasonable alternative to entering the agreement is likewise a question of law. In *Applied Genetics*, the Tenth Circuit, applying Wyoming law, uses language indicating that whether reasonable alternatives existed involves a disputed question of fact. *Applied Genetics*, 912 F.2d at 1242. However, even if the question of whether reasonable alternatives existed is deemed a question of fact, a plaintiff still must show facts sufficient that a reasonable juror could find the absence of reasonable alternatives. The court finds that plaintiff has failed to make such a showing in this case.

8. The record is unclear as to whether plaintiff was employed under the terms of a written Locus Tecum contract signed with defendant, or under an informal agreement with the hospital during the negotiation stage. However, in either event, there is no evidence before the court that there was ever a threat to terminate plaintiff's employment if he failed to sign the written contract.

9. *Blubaugh* cites the Tenth Circuit's opinion in *Applied Genetics* and, based in part on that case, proceeds to specifically adopt the economic duress doctrine in Wyoming and apply it to the facts before the court. *Blubaugh*, 842 P.2d at 1075.

allow the defendant to fire him and seek relief from the courts. *Id.* at 1076–77. The plaintiff has made no showing why the alternatives available to him were unreasonable here as well.

Plaintiff has argued strenuously that the absence of counsel is a significant factor supporting his claim of duress. In *Applied Genetics*, the court stated that "the presence of counsel during the negotiations does not automatically preclude a finding of involuntariness." *Applied Genetics*, 912 F.2d at 1242. Conversely, this court recognizes that the absence of counsel at the moment the decision to sign was made does not automatically make assent to a contract involuntary. Plaintiff has failed to meet his burden of presenting any evidence of how the presence of counsel would have affected the plaintiff's decision to sign the written contract. During the negotiation stage, plaintiff consulted with attorneys and was advised that a suit could be filed to compel action by the defendant. Thus, he was apprised of his legal position and the likelihood of prevailing on his contract by estoppel claim. Moreover, plaintiff has not alleged that he misunderstood any of the terms of the contract he was signing. Indeed, many of the contract terms, including the crucial merger clause, were contained in earlier drafts of the contract proposed by the plaintiff to the defendant. Thus, the court concludes that plaintiff's lack of counsel at the time he signed the substituted contract does not add weight to his duress argument.

Kansas courts have shown no indication to permit contracting parties to avoid the consequences of their bargains lightly, even where there has been some degree of compulsion or hard bargaining. *Evans v. Aylward*, 166 Kan. 306, 201 P.2d 1044 (1949) involved a suit to set aside a release given by one partner to another, and for an accounting. The plaintiff claimed the release was involuntarily given under duress because it was demanded when he was ill and in dire financial straights. The court first observed that plaintiff's illness was not such as to deprive him of the ability to exercise his free will. As to the alleged financial distress, the court stated that "[c]ontracts, sales or compromises, made under stress of pecuniary necessity, are of daily occurrence, and if such urgency is to affect their validity, no one could safely negotiate with a party who finds himself in difficulty by virtue of financial adversities." *Id.* at 316, 201 P.2d 1044 (quoting *Starks v. Field*, 198 Wash. 593, 599, 89 P.2d 513 (1939)). The court concluded that "[s]ummed up, all plaintiff's evidence established was that he preferred the immediate settlement on the terms made than the hazard of a lawsuit. Parties are confronted with that problem every day." *Id.* 166 Kan. at 317, 201 P.2d 1044.

The plaintiff here, under concern for his financial position, traded his potential lawsuit for the security of a fixed duration contract. He has not demonstrated that his alternatives were so limited, however, as to have deprived him of his free will. This court has found no Kansas case which has set aside a contract under circumstances such as the parties have set forth here and the court finds that plaintiff's duress argument falls short as a matter of law.

## IV. Conclusion

As set forth above, the court finds that a substituted contract was entered into between plaintiff and defendant which supplanted the contract by estoppel on which plaintiff brought this case. The plaintiff has failed to meet his burden of producing evidence sufficient to show, if true, that the substituted contract was signed under duress and should not control. Thus, the plaintiff's claim fails and the defendant's motion must be granted.

**IT IS, THEREFORE, BY THE COURT ORDERED THAT** defendant's motion for summary judgment (Doc. # 23) is granted.

**IT IS SO ORDERED.**