(261 P.3d 898)
No. 102,853

BANK OF AMERICA, N.A., *Appellant*, v. SANJIV NARULA, INDUBALA NARULA, and PROMOTIONAL RESOURCES, INC., *Appellees*.

Opinion filed July 29, 2011.

*Christine L. Schlomann, David L. Going,* and *Thomas B. Weaver,* of Armstrong Teasdale LLP, of Kansas City, Missouri, for appellant.

*Robert J. Bjerg,* of Colantuono Bjerg Guinn, LLC, of Overland Park, and *Michael D. Strobehn,* of Walters, Bender, Strobehn and Vaughan, P.C., of Kansas City, Missouri, for appellees.

Before GREENE, C.J., GREEN and LEBEN, JJ.

GREEN, J.: This litigation arises out of a Loan Agreement for the construction of a new office building by the owners: Sanjiv Narula, Indubala Narula, and their closely held business, Promotional Resources, Inc. (the Narulas). Bank of America, N.A., encouraged the Narulas to construct the building. Moreover, it furnished a financing package to the Narulas to construct the building. The package included the Loan Agreement. Under the Loan Agreement, the Narulas received a Construction Loan that required monthly interest-only payments to Bank of America while the building was being constructed. The Loan Agreement also stated that if construction of the building was completed by December 31, 2001, the Construction Loan would automatically convert to a Permanent Loan.

In August of 2004, Bank of America sued the Narulas to foreclose its commercial mortgage on the building and for the breach of the Loan Agreement and note. The Narulas counterclaimed for damages caused by Bank of America's failure to convert the Construction Loan to a Permanent Loan. The Narulas' counterclaims included claims for breach of contract, breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, and breach of fiduciary duty. Before trial, the trial court also granted the Narulas leave to amend their counterclaims to assert a claim for punitive damages against Bank of America.

The case was tried to the court. After an 8-day bench trial, the trial court denied Bank of American's claims and granted the Narulas' counterclaims. The trial court awarded the Narulas $793,997 in compensatory damages and $750,000 in punitive damages. Bank of America appeals from the judgment against it on the counterclaims.

On appeal, Bank of America raises a number of issues: (1) whether the trial court correctly ruled that Bank of America was not entitled to recover interest on the note after December 31, 2001, because the bank was the first party to materially breach the Loan Agreement; (2) whether the trial court's finding that the Modification Agreements to the Loan Agreement were unenforceable was supported by substantial competent evidence; (3) whether the trial court's finding that Bank of America breached the Loan Agreement was supported by substantial competent evidence; (4) whether the trial court's finding that Bank of America breached its fiduciary duty to the Narulas was supported by substantial competent evidence; (5) whether the trial court's finding that Bank of America breached its duty of good faith and fair dealing in the Loan Agreement was supported by substantial competent evidence; (6) whether the trial court's award of $386,603 in damages for the forced liquidation of the Narulas' personal investments was supported by substantial competent evidence; and (7) whether the Narulas' claim for punitive damages was properly before the court, and, if so, whether the bank employee's conduct was willful, wanton, or malicious, and whether there was clear and convincing evidence that the conduct on which the court based punitive damages was authorized or ratified by someone at the bank expressly authorized to do so. Finding no reversible error, we affirm.

In this complex case, the trial court made the following findings. It found that the Narulas had a long-standing, close relationship with Bank of America. From 1993 until May 2001, the Narulas' principal personal banker, known as a "Relationship Manager," was Charles Wooten, a banker for Bank of America. He met with the Narulas many times and gave them advice on various personal and business financial matters such as working capital lines of credit, management of accounts receivable, creditworthiness of customers, and the Narulas' investment accounts.

The evidence showed that Bank of America handled both the Narulas' business needs and their personal investment funds. Bank of America repeatedly promoted itself to the Narulas as their

"Trusted Financial Advisor." Bank of America wanted the Narulas to rely on it for its advice and counsel.

The Narulas, for their part, relied heavily on Bank of America as their "Trusted Financial Advisor" in their personal and business affairs, and Bank of America knew that the Narulas were relying on them for financial advice. Part of this advice dealt with various estate planning and trust issues. In 1998, Bank of America put together a team of estate planning advisors and made presentations to the Narulas on their estate planning needs.

Also in 1998, Promotional Resources, the Narulas' business, was outgrowing its office space. Wooten suggested to the Narulas that they should consider constructing their own building. Wooten told the Narulas that the building could be an important part of their estate plan and could serve as a source of income during their retirement. Wooten even suggested the building site, telling the Narulas that he had another customer who had just finished constructing an office building in the Corporate Lakes division in Overland Park and that construction sites were still available.

The Narulas liked Wooten's idea but told him that they had no experience in constructing a building or how to finance it. Wooten explained that they should not worry because Bank of America would hold their hand through the entire process. The Narulas agreed, on two conditions: (1) that there be guaranteed financing once the construction of the building was completed; and (2) that the permanent financing carry a fixed interest rate.

Bank of America told the Narulas that although it could provide both the construction and permanent financing for the building, it could not provide them with a fixed rate of interest. Nevertheless, Bank of America told the Narulas that through the use of a swap interest rate protection agreement, they would effectively end up with such a fixed rate of interest. These swap agreements were a profitable source of income for Bank of America. Bank of America earned a fee for placement of each swap agreement, and under its accounting rules, it was allowed to record as income the entire fee at the beginning of the swap transaction rather than spreading the fee over the entire term of the swap agreement. Bank of America encouraged its officers to promote swap agreements to their cus-

tomers. Bank officers were given incentives to sell swap agreements through their annual bonuses, which were in part based on the number of swap agreements sold by the officers throughout the year.

Bank of America knew that the Narulas had no experience or understanding as to how a swap interest rate product worked. Wooten once again assured the Narulas that Bank of America would guide them through the entire process. Because Wooten lacked experience in the use of swap interest rate products, Bank of America had experts from its derivatives group in Chicago make a PowerPoint presentation to the Narulas concerning swap agreements.

Nevertheless, the initial presentation was flawed. Bank of America incorrectly told the Narulas that they would owe a swap termination payment if interest rates rose, but the contrary was true. The Narulas would owe a swap termination payment if interest rates fell. There was evidence in the record that Bank of America had failed to clearly explain to the Narulas what would happen if the bank decided not to make the Permanent Loan: that the Narulas could be charged a substantial termination fee.

On September 29, 2000, Bank of America and the Narulas signed a written Loan Agreement for the construction and financing of the building. Because the Narulas had dealt with Bank of America without counsel before, they did not retain counsel in this instance. The Loan Agreement called for three loans: (1) a Construction Loan in the amount of $1,320,000; (2) a Permanent Loan in the same amount to replace the Construction Loan once the construction of the building was completed; and (3) a Term Loan in the amount of $140,000 for the operation of the Narulas' business.

The Construction Loan was a monthly interest only loan at a variable rate of interest based on London Inter-Bank Offered Rate (LIBOR) plus 2.5%. At the commencement of the Construction Loan, this rate was 9.12%. The projected date for the completion of construction was September 29, 2001, the Construction Loan Maturity Date.

Once the building was completed, the Construction Loan would automatically convert to the Permanent Loan. The Permanent Loan was to be a 5-year term loan amortized over 20 years, also at LIBOR plus 2.5%. Because the Loan Agreement did not contain a financial insecurity provision, the Narulas were not required to obtain new credit approval when the Construction Loan was to be converted to the Permanent Loan. Moreover, Bank of America could not refuse to convert to the Permanent Loan for credit or financial insecurity reasons.

The Narulas also signed a Swap Agreement based on Bank of America's advice. The Swap Agreement was a nonnegotiable, lengthy, pre-printed form in small print that was not shown to the Narulas before signing nor was it explained to them during closing. Bank of America actually had the Narulas sign the wrong forms of the Swap Agreement. Consequently, several months after closing the Loan Agreement, Bank of America asked the Narulas to sign the correct forms, which they did.

The Swap Agreement had a forward rate lock feature, which permitted the Narulas to lock in their swap interest rate during the construction phase of the building. Based on the advice of Bank of America's swap derivative group, the Narulas locked in an 8.76% fixed interest rate under the Swap Agreement on January 29, 2001. Later, in his first personal visit to the Narulas in August 2001, Bank of America Officer Dennis Nicely concluded that the Narulas had no idea as to how the Swap Agreement worked.

In August 2001, Promotional Resources moved into the building as a tenant under a temporary occupancy permit issued by the City of Overland Park. As the original construction deadline of September 29, 2001, approached, the construction was virtually complete except for some minor punchlist items. To provide time for these items, the parties agreed to sign a First Modification and Extension Agreement, which extended the Construction Loan Maturity Date for 3 months to December 29, 2001. Because December 29, 2001, fell on a Saturday, the effective date of the Extension Agreement was dated for December 31, 2001.

At this point, the Narulas were fully current with all their loan payments. Nicely, however, developed concerns as to the Narulas' cash flow and their future ability to service the debt.

Bank of America internally keeps an exposure strategy on all of its outstanding loans, which are divided into three categories: (1) decrease, (2) maintain, or (3) out. Bank of America's exposure strategy had been to maintain the Narulas' loans. Nicely, however, decided that the Narulas' loans should be transferred to the Special Assets Unit in St. Louis for restructuring. This meant that Bank of America wanted to change its loan agreements and notes with the Narulas in a way that would benefit the bank.

David Orf, who worked in the Special Assets unit of the Bank, took over the loans in late October 2001. The Narulas were not initially told about the transfer of their loans, and when they inquired about the transfer of their loans, Bank of America did not explain. Orf changed the exposure strategy of the Narulas' loans to "out." This meant that the bank wanted all of the Narulas' loans out of Bank of America, including the obligation to make the Permanent Loan. Bank of America took this step because of its concern as to the Narulas' cash flow and their ability to service the debt obligations to the bank. Yet, the Loan Agreement contained no provision that allowed Bank of America to refuse to convert the Construction Loan to the Permanent Loan because of cash flow or credit concerns.

As stated earlier, the Narulas were unaware of the change in the exposure strategy, and Orf did not tell them. The Narulas still believed that Bank of America would convert the Construction Loan to the Permanent Loan on December 31, 2001.

Conversion of the Construction Loan to the Permanent loan on December 31, 2001, required two conditions: (1) issuance of a final Certificate of Occupancy by the City of Overland Park; and (2) receipt by Bank of America of appropriate releases of mechanic's liens from all of the contractors and suppliers. The Narulas presented the final Certificate of Occupancy to Bank of America on or about December 18, 2001. Moreover, the parties further stipulated in this action that construction of the building was physically completed by December 31, 2001.

As to the second condition, on December 31, 2001, the general contractor faxed to Bank of America a final lien waiver for all of its work on the building contingent only on receipt of a final payment

from Bank of America in the amount of $17,506. The Loan Agreement permitted lien waivers to be "either appropriate unconditional or conditional (conditioned only on payment)." Bank of America officers, including Nicely and Orf, testified at trial that an appropriate release under the Loan Agreement could be a conditional lien release that was contingent only on payment.

When Bank of America failed to convert the Construction Loan to the Permanent Loan on December 31, 2001, it continued to pursue its strategy to "out" the Narulas' loans. In mid-January 2002, Orf contacted the Narulas and told them that they needed to sign another Modification and Extension Agreement to extend the Construction Loan Maturity Date. Orf stated that another extension was necessary to process the final draw of $17,506 to the general contractor.

Nevertheless, Orf's real intention seemed to be the removal of Bank of America's obligation to make the Permanent Loan in the Loan Agreement. With the assistance of legal counsel, Bank of America prepared a Second Modification and Extension Agreement containing an inconspicuous provision that deleted the bank's obligation to make the Permanent Loan. Bank of America's counsel intentionally prepared the Second Modification and Extension Agreement to look almost like the First Modification and Extension Agreement. Bank of America's counsel did that to disguise the provision removing the bank's obligation to make a Permanent Loan. The trial court quoted the January 18, 2002, e-mail to Orf from Bank of America's counsel to establish this fact.

Orf did not tell the Narulas of the actual intent behind the Second Modification and Extension Agreement. He told them that Bank of America had been unable to make the Permanent Loan because the final draw had not been paid to the general contractor. Although the Narulas were on a business trip to Chicago, Orf sent the agreement to them by overnight delivery, insisting that they immediately sign the Second Modification and Extension Agreement and return the agreement to him by overnight delivery. When the Narulas inquired whether the matter could wait until they returned home, Orf stated that it could not.

Orf told the Narulas that they were required to immediately sign the extension agreement because the Construction Loan had matured on December 31, 2001. He further warned them that if they did not sign the document, the entire balance of nearly $1.32 million would immediately become due and payable. Orf knew that the Narulas could not pay the entire balance. Additionally, he told them that the failure to pay the entire balance would result in a foreclosure on the building.

When the Narulas received the Second Modification and Extension Agreement in Chicago, it looked identical to the First Modification and Extension Agreement that they had signed a few weeks before. Believing it was just a short extension of the Construction Loan Maturity Date to process the final payment to the general contractor, the Narulas signed the document the same day and returned it to Orf, as directed, by overnight delivery.

Orf did not tell the Narulas at that time that the Swap Agreement had a negative balance of nearly $100,000. Moreover, Orf had known the Swap Agreement was underwater for several months, but he did not tell the Narulas that by signing the Second Modification and Extension Agreement, they would be liable for such a substantial termination fee when the Construction Loan matured on February 4, 2002.

After the Narulas signed and returned the Second Modification and Extension Agreement, Orf told them that Bank of America wanted them to find another lender for their loans. Orf did not tell them that Bank of America would never make the Permanent Loan as originally promised in the Loan Agreement. Instead, he told the Narulas that Bank of America would continue to work with them towards restructuring their loans.

When the Narulas tried to find another lender, interest rates had fallen substantially since the commencement date of their loan: from 9.12% to approximately 4.25%. That being so, the Narulas were anxious to see if they could obtain a lower rate on their loan from another lender. During this process, however, the Narulas learned that because the interest rates had fallen significantly since the date they locked in their swap interest rate, they would incur a very substantial swap termination fee if they paid off and termi-

nated their loan with Bank of America. Because this would push them into an unfavorable debt to equity ratio, the Swap Agreement prevented other lenders from viewing the Narulas as a good credit risk. They were unable to secure a loan to pay off Bank of America's loans.

At that point, the Narulas were basically out of options. With practically no bargaining power left, the Narulas chose to sign another Modification and Extension Agreement presented by Bank of America. First, however, Bank of America asked the Narulas to begin the process of liquidating funds from their personal investment accounts to pay down the balance of the corporate line of credit. The Narulas reluctantly conceded to the demands of the bank to liquidate their personal investment accounts.

On May 31, 2002, the parties signed a Third Modification and Extension Agreement that extended the Construction Loan to October 15, 2002, and changed the interest rate "from LIBOR plus 2.5% to Prime plus 3.0%, with a minimum monthly payment of $12,500." This increased the total interest rate under the Construction Loan from 8.76% to 12.16%. The Narulas' total monthly interest payments were increased from approximately $11,600 to approximately $17,500.

Contrary to the Narulas' instructions, Bank of America began making trades in one of the Narulas' investment accounts. On July 11 and 12, 2002, the bank simultaneously bought and sold over $115,000 in mutual funds in the Narulas' account, which resulted in commissions being paid to Bank of America. It then required the Narulas to liquidate their investment accounts and to pay off the entire balance of the line of credit as a condition to the Fourth Modification and Extension Agreement.

After the line of credit was paid off, the Term Loan was rolled into the Construction Loan. The Construction Loan now totaled $1.5 million, and this was the only remaining note. On October 9, 2002, the parties signed a Fourth Modification and Extension Agreement that extended the maturity of the Construction Loan to March 31, 2003.

On April 1, 2003, Bank of America sent the Narulas a written Notice of Default. Bank of America gave the Narulas 10 days to

pay in full the entire balance of the Construction Loan of $1,481,997. On April 11, 2003, Bank of America demanded a swap termination fee as a result of an early termination of the Swap Agreement in the amount of $183,918.38. When the Narulas failed to pay the balance of the Construction Loan and the swap termination fee, Bank of America sued the Narulas in August of 2004.

As noted earlier, the trial court ruled for the Narulas. Basing its ruling on breach of contract, breach of the duty of good faith and fair dealing, lack of consideration, breach of fiduciary duty, negligent misrepresentation, and fraud, the trial court awarded compensatory damages of $763,997, plus prejudgment interest. The trial court offset this amount against the unpaid principal balance of the Construction Loan, which totaled $1,481,997. The trial court further determined that Bank of America was not entitled to any interest payments after the date of its breach, December 31, 2001. The trial court also found Bank of America liable for punitive damages in the amount of $750,000.

Bank of America then brought the present action.

*Standard of Review*

We "generally" review a trial court's "findings of fact to determine if the findings are supported by substantial competent evidence and are sufficient to support the [trial] court's conclusions of law." *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009). "Substantial competent evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion." 288 Kan. at 65. Where the question turns on the interpretation of written documents, our review is unlimited. *Shamburg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009).

*Releases*

Bank of America first argues that the Narulas released it from liability by signing the Second, Third, and Fourth Modification and Extension Agreements. All of these Agreements included the following language: "As a material inducement to [Bank of America] to enter into this Agreement, [the Narulas] hereby . . . . release,

acquit and forever discharge [Bank of America] . . . from any and all claims . . . now *known, suspected, or unknown.*" (Emphasis added.) The First Modification and Extension Agreement contained similar language, but it released only those claims "now *known or suspected.*" (Emphasis added.) Bank of America's counsel, in the January 18, 2002, e-mail to Orf regarding the Second Modification and Extension Agreement, stated: "I changed the release provision a bit . . . to add a release for unknown claims—it may be unenforceable, but I like to have it there anyway."

The change to the Second Modification and Extension Agreement is telling. Bank of America would have known that any claims arising from its decisions were unknown to the Narulas in mid-January 2002. With respect to the enforcement of such releases, "Kansas is among the states where language in a release which purports to relinquish unknown claims as well as known claims is not viewed as conclusive on its face. [Citations omitted.]" *Ferguson v. Schneider National Carriers, Inc.,* 826 F. Supp. 398, 400 (D. Kan. 1993). The trial court refused to enforce the releases for several reasons, and we will consider each separately.

*Lack of Consideration*

The trial court first held that the Second Modification and Extension Agreement was "unenforceable because it is not supported by adequate legal consideration." Bank of America, however, maintains that it did provide consideration. The adequacy of consideration on a release is "normally for the trier of facts," *Fieser v. Stinnett,* 212 Kan. 26, 28, 509 P.2d 1156 (1973), with review for substantial competent evidence. See *Wichita Clinic v. Louis,* 39 Kan. App. 2d 848, 868, 185 P.3d 946, *rev. denied* 287 Kan. 769 (2008).

The trial court found "only two potential forms of consideration." The first was language in the Second Modification and Extension Agreement mentioning "Ten Dollars ($10.00) and other good and valuable consideration." The trial court found "the $10.00 was never paid by [Bank of America] to the Narulas," and Bank of America does not contest this finding.

The second form of consideration was "the extension of the Construction Maturity Date from December 31, 2001 to February 4, 2002." Bank of America maintains on appeal that "[w]ithout an extension of the Maturity Date, [the] Narulas could not receive the final disbursement." The trial court treated this consideration as illusory, however, because "the two prerequisites for the conversion of the Permanent Loan . . . had already been satisfied by December 31, 2001: (1) the issuance of a Certificate of Occupancy; and (2) 'appropriate releases' of mechanic's liens." Thus, the trial court reasoned that "an extension of the Construction Loan Maturity Date gave nothing of benefit or value to the Narulas. Only the Bank benefited from the extension, so that it could issue its final payment to the general contractor."

By contrast, Bank of America argues that the trial court "confused the conditions precedent for the Permanent Loan with the conditions for the disbursement of the final holdback. Even if the Narulas satisfied the conditions precedent for the Permanent Loan, they did not satisfy the conditions precedent for the final disbursement prior to December 31, 2001." Bank of America relies upon Section 9 of the Loan Agreement, which governed "final Disbursement of the Holdback." The Holdback was defined as "10%" of the "hard construction costs" on the building. Section 9 required both "Certificates of Completion" and a "final unconditional lien waiver or release" before Bank of America was required to disburse the Holdback. Bank of America contends that because both conditions were not met by December 31, 2001, it "had no obligation to disburse the [Holdback]" and that "[a]fter that date, [it] could not make any disbursements unless the Maturity Date was extended."

Bank of America raised this argument below, where it identified a "Holdback amount of $18,000." The trial court, however, rejected this argument. Nevertheless, if we assume the amount in question was the Holdback, Bank of America is partially correct. The conditional lien release it received on December 31, 2001, was not a "final unconditional lien release" as required by the Loan Agreement for final disbursement because it was conditioned on payment of $17,506.

Bank of America further assumes that final disbursement must have occurred on or before the Construction Loan Maturity Date. On the contrary, we do not read the written provisions that way. The general contactor's conditional release made the release "contingent upon receipt of payment," and it showed a "Contract Balance" of "-0-" based on "Current Payment" of $17,506. Moreover, according to the Loan Agreement, the Narulas appointed Bank of America as "their true and lawful attorney in fact to make Disbursements directly, or jointly with the [Narulas], in [Bank of America's] sole discretion, to . . . [t]he General Contractor . . . or other party in payment of amounts due under construction contracts relating to the Improvements." As a result, Bank of America needed "[n]o further authorization" from the Narulas "to authorize [it] to make such Disbursements, and all such Disbursements shall satisfy [Bank of America's] obligations hereunder." Taking this all together, the general contractor's conditional release was also a claim for payment upon Bank of America.

When we consider that under the Loan Agreement, "[t]he proceeds of the Permanent Loan shall be used . . . solely to pay off the principal and interest balances of the Construction Loan on or before the Construction Loan Maturity Date," we can conclude that claim was made for the Holdback by the Construction Loan Maturity Date of December 31, 2001. Final disbursement, however, was not required because the release provided to Bank of America was still conditional. Yet, conversion to the Permanent Loan was required because, for that action, a conditional release was sufficient.

When the Narulas met the conditions precedent for conversion to the Permanent Loan on December 31, 2001, as Bank of America concedes for the sake of this argument, conversion should have occurred. All things considered, Bank of America, not the Narulas, created the need to extend the Construction Loan Maturity Date when it decided the Permanent Loan was not in its best interests. The extension did not benefit the Narulas, and the Second Modification and Extension Agreement therefore failed for a lack of consideration. As a result, the trial court properly determined that

this one-sided bargain failed for lack of consideration. See *Robbins v. City of Wichita*, 285 Kan. 455, 471-72, 172 P.3d 1187 (2007).

*Prior Material Breach*

The trial court also held that the Second, Third, and Fourth Modification and Extension Agreements were unenforceable because Bank of America was the first party to materially breach the Loan Agreement when it failed to convert the Construction Loan to the Permanent Loan on December 31, 2001. The trial court reasoned that "a party who has first materially breached a contract is precluded from attempting to enforce that contract until the breach is cured. As a result, all of the subsequent Modification and Extension Agreements are unenforceable . . . because [Bank of America] was in material breach of the Loan Agreement." Nevertheless, Bank of America contends that the material breach rule does not apply because the Second, Third, and Fourth Modification and Extension Agreements were "separate agreements supported by consideration." Breach is itself a question of fact, *Wichita Clinic*, 39 Kan. App. 2d at 868; but here, we are exercising unlimited review over the trial court's conclusion of law regarding the effect of a first material breach. See *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007).

We have previously determined that the Second Modification and Extension Agreement was not supported by adequate consideration. We agree with Bank of America, however, that the Narulas could have released it from any claims for a prior material breach. See *Frye v. St. Thomas Health Services*, 227 S.W.3d 595, 612 (Tenn. Ct. App. 2007) (employer breaching employment contract "remains liable for breach . . . unless the facts clearly demonstrate a fairly bargained for release of the employer"). A release presumes a claim to be released.

Here, we determine that the trial court erred in holding any releases between the parties were unenforceable simply because Bank of America had committed a prior breach of the Loan Agreement. Conversely, this does not mean any releases were "fairly obtained and understandingly executed." *Railway Co. v. Goodholm*, 61 Kan. 758, Syl. ¶ 1, 60 P. 1066 (1900). Whether Bank of

America fairly obtained the Second, Third and Fourth Modification and Extension Agreements, and whether the Narulas understandingly executed them, are considered next.

*Fraud*

The trial court held the "Second, Third and Fourth Modification [and Extension] Agreements are unenforceable on the grounds that they were deceptively induced by [Bank of America] and they were the product of economic duress and adhesion." The trial court found that Bank of America intentionally deceived the Narulas into believing that they were merely signing another extension agreement just like the First Modification and Extension Agreement a few weeks previously. The trial court further found that the Narulas had no idea what was meant by the sentence, "Section 2.2 of the Loan Agreement is hereby deleted in its entirety." Section 2.2 of the Loan Agreement dealt with Bank of America's obligation to make the Permanent Loan.

The trial court's rationale applies to the Second Modification and Extension Agreement, but not to the Third and Fourth. Bank of America argues, in fact, that the Narulas "neither pleaded nor claimed . . . that they were fraudulently induced into signing either the Third or Fourth Modification [and Extension Agreement.]" Indeed, the Narulas assert their fraud claim only with respect to the Second Modification and Extension Agreement. As a result, we conclude that the trial court's fraud finding went to the Second Modification and Extension Agreement only. With these points in mind, we turn to the fraud issue.

"Fraud is never presumed and must be established by clear and convincing evidence." *Alires v. McGehee*, 277 Kan. 398, Syl. ¶ 1, 85 P.3d 1191 (2004). "The existence of fraud is normally a question of fact. The standard of review on appeal is limited to determining whether the district court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law." 277 Kan. 398, Syl. ¶ 2. Moreover, "[t]he elements of an action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard

for the truth, upon which another party justifiably relies and acts to his or her detriment." *Alires*, 277 Kan. 398, Syl. ¶ 3.

In this case, the trial court concluded that Bank of America "failed to disclose that [Bank of America] knew that the swap agreement was at least $100,000 'under water' at the time of the signing of the Second Modification [and Extension Agreement]." A duty to disclose arises when the party in a business transaction knows that the other party is about to enter into a contract or business transaction under a mistake about facts basic to the contract or the business transaction, and that the other party, because of the relationship between them, the customs of the trade, or other objective circumstances, would reasonably expect disclosure of those facts. Restatement (Second) of Torts § 551(2)(e) (1977).

Our Supreme Court cited Restatement (Second) of Torts § 551(1)and (2)(e) (Ten. Draft No. 12, 1966) with approval in *Griffith v. Byers Construction Co.*, 212 Kan. 65, 71, 510 P.2d 198 (1973):

"(1) One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"(2) One party to a business transaction is under a duty to disclose to the other before the transaction is consummated.

. . . .

"(e) Facts basic to the transaction, if he knows that the other, is about to enter into the transaction under a mistake as to such facts, and that the other, because of the relationship between them, the customs in the trade, or other objective circumstances, would reasonably expect a disclosure of such facts."

The *Griffith* court stated that the Restatement (Second) of Torts §§ 552(1) and (2)(e) language approximated the rule that the court had adopted in *Jenkins v. McCormick*, 184 Kan. 842, Syl. ¶ 1, 339 P.2d 8 (1959) (holding that "failure of [a] vendor to disclose [a] defect in [a] property constitutes actionable fraudulent concealment"). The rule set forth in *Griffith* was later adopted in the final draft of the Restatement (Second) of Torts § 551(2)(e) (1977).

In *Griffith*, homeowners sued the developer for breach of implied warranty and for fraudulent concealment. The trial court

granted summary judgment in favor of the developer. On appeal, our Supreme Court reversed, holding that the homeowners (purchasers) could recover on the theory of fraud from the developer of the residential lots because the developer had knowledge of the defect in the soil and failed to disclose the defect to the homeowners. Our Supreme Court held that the developer's "failure to disclose this defect in the soil condition to the purchasers could constitute actionable fraudulent concealment." See also *Boegel v. Colorado Nat'l Bank of Denver*, 18 Kan. App. 2d 546, 550-51, 857 P.2d 1362, *rev. denied* 253 Kan. 856 (1993) (where this court discussed and applied the *Griffith's* nondisclosure rule which, as stated earlier, was based on Restatement [Second] of Torts § 551(2)(e).

In *Boegel*, the court pointed out that a duty to disclose would arise in cases under three situations: (1) when a disparity exists between two contracting parties in either bargaining power or expertise; (2) when a known defect is not known to or is not reasonably discoverable by the buyer; or (3) when a party knows the other party is entering the contract under a mistake about important facts and, because of custom in the trade or other objective circumstances, the other party would reasonably expect disclosure of those facts. *Boegel*, 18 Kan. App. 2d at 549-50.

Based on the facts, it is apparent that Bank of America was aware that the Narulas were entering into the Second Modification and Extension Agreement under a mistake about the Swap Agreement. Although Bank of America maintains that the Narulas knew of the early termination fee, Orf could not recall at trial whether he told the Narulas the Swap Agreement was $100,000 underwater. Moreover, Orf's files contained no note showing that he had disclosed the early termination fee to the Narulas. Needless to say, Orf knew that if the Narulas were told that their Swap Agreement was $100,000 underwater, the Narulas would have had absolutely no incentive to sign the Second Modification and Extension Agreement.

Indeed, Sanjiv Narula testified that he first learned about the swap termination fee when he sought out other lenders. Because of the unfavorable debt to equity ratio caused by the swap termi-

nation fee, the Narulas were told by the other lenders that they could not make them a loan. Moreover, when Sanjiv was asked, "Had you known that by signing the Second Modification [and Extension Agreement] and if the [P]ermanent [L]oan then was deleted and cancelled that you would have to pay a large termination fee, would you have signed the [document]," he answered, "I would not have signed it under either conditions [*sic*] deleting the permanent note, or if I had known that there was a penalty." The trial court's finding was supported by the evidence.

In addition, the trial court concluded that Bank of America committed fraud when Orf, through the assistance of legal counsel, deceptively removed the provision requiring the bank to make a Permanent Loan to the Narulas under the Second Modification and Extension Agreement. Bank of America does not directly challenge the trial court's findings regarding Orf's statements. It instead maintains, based on the text of the Second Modification and Extension Agreement and the Narulas' education and experience, that they did not justifiably rely on Orf's statements to them. Bank of America further argues that "[t]he evidence establishes that [the] Narulas were on notice of, or could have discovered through reasonable diligence, that the Second Modification [and Extension Agreement] deleted the [P]ermanent [L]oan provisions." Based on this argument, it would seem that Bank of America is asking us to reweigh the evidence or redetermine the questions of fact, both of which are outside our standard of review. See *Hodges*, 288 Kan. at 65. Consequently, our question is whether a reasonable person could conclude, as did the trial court, that the Narulas justifiably relied on Orf's statements about the purpose and effect of the Second Modification and Extension Agreement. We believe a reasonable person could find justifiable reliance.

The language eliminating the Permanent Loan was not conspicuous, in our opinion. It was not "so written that a reasonable person against whom it is to operate ought to have noticed it," for example by being "printed . . . in capitals." K.S.A. 84-1-201(10). There were no other features such as contrasting color or font to set it apart from the rest of the text. See *J & W Equipment, Inc. v. Weingartner*, 5 Kan. App. 2d 466, 469-71, 618 P.2d 862 (1980). Although

the language was not in smaller print than the surrounding text; see *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320, 330, 582 P.2d 1111 (1978), the Second Modification and Extension Agreement did not alert the Narulas to the significant amendments it made to the Loan Agreement.

There was little else to "serve as a danger signal to a person of ordinary intelligence and experience." *Young v. Hecht*, 3 Kan. App. 2d 510, Syl. ¶ 7, 597 P.2d 682, *rev. denied* 226 Kan. 793 (1979). Bank of America's attorney drafted the Second Modification and Extension Agreement to eliminate such a signal. Bank of America had served as the Narulas' trusted financial advisor for a number of years, and the Narulas had no reason to suspect a document provided to them by this advisor would eliminate the Permanent Loan, a critical part of the financing. When Orf insisted on a quick response, he gave a rationale couched in the complexities of loan administration. We cannot conclude that the Narulas' education and experience somehow precluded the trial court's finding. See *Prather v. Colorado Oil & Gas Corp.*, 218 Kan. 111, Syl. ¶ 3, 542 P.2d 297 (1975) ("While in the ordinary business transactions of life, [persons] are expected to exercise reasonable prudence, this requirement is not to be carried so far that the law shall ignore or protect positive, intentional fraud successfully practiced upon the . . . unwary."); *Manufacturing Co. v. King and Dickey*, 104 Kan. 210, Syl. ¶, 178 P. 621 (1919) (allowing a defense against a written instrument where the signature was "induced . . . by false and fraudulent representations as to its contents," and where the signatory had "neither time nor opportunity to read it . . . [and] signed in reliance upon those representations").

Thus, in addition to being unenforceable for lack of consideration, the Second Modification and Extension Agreement was unenforceable for fraud. See *Railway Co. v. Goodholm*, 61 Kan. 758, Syl. ¶ 1, 60 P. 1066 (1900) (release was unenforceable where induced "by false and fraudulent representations"). We must next consider whether the Second Modification and Extension Agreement, along with the Third and Fourth Modification and Extension Agreements, was also unenforceable for duress.

*Economic Duress and Adhesion*

The trial court concluded that the Second, Third, and Fourth Modification and Extension Agreements were the product of "economic duress." It specifically found that Orf had "forced the Narulas to sign" the Second Modification and Extension Agreement. It further found that once Bank of America had their signatures, it "had complete control over [the Narulas,] who had no options other than to agree to Bank [of America's] demands" on the later Agreements.

The trial court stated in passing that some or all of the Agreements were "contracts of adhesion and are unenforceable." Contracts of adhesion are not unenforceable per se. Rather, enforcement turns on unconscionability. See *Bender v. Kansas Secured Title & Abstract Co.*, 34 Kan. 399, Syl. ¶ 1, 119 P.3d 670 (2005); *Ed Bozarth Chevrolet, Inc. v. Black*, 32 Kan. App. 2d 874, 886-87, 96 P.3d 272, *rev. denied* 277 Kan. 923 (2003). Bank of America contends that the Narulas "offered no evidence" and the trial court "made no finding" on unconscionability. Although the Narulas mention the trial court's finding of adhesion, they do not brief it. Because the trial court made no specific findings on unconscionability and its separate finding of duress is supported by the record, we need not address whether unconscionability would separately support its ruling.

Now, turning to duress, we note that what constitutes duress is a question of fact. Nevertheless, whether the facts constitute duress is a question of law. *Comeau v. Mt. Carmel Medical Center, Inc.*, 869 F. Supp. 858, 864 (D. Kan. 1994); *Hastain v. Greenbaum*, 205 Kan. 475, 482, 470 P.2d 741 (1970). Bank of America frames its response around the *Comeau* decision, which both parties cite. Before continuing, we must consider the test set out in the *Comeau* decision.

*Comeau* relied in part upon *Applied Genetics Intern., Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238 (10th Cir. 1990), which construed Wyoming law. 869 F. Supp. at 864. *Applied Genetics Intern., Inc.* included at least one element not explicitly found in Kansas cases, "the absence of a reasonable alternative to

entering the agreement." 869 F. Supp. at 865. The *Comeau* court added this element to Kansas law on the basis that it was implicit in the Kansas cases and also consistent with Restatement (Second) of Contracts § 175 (1979). 869 F. Supp. at 864-65.

Our research located no Kansas appellate case citing *Comeau* or otherwise approving its test for "economic duress." Our own Supreme Court, however, has articulated a test for "duress by threats" as follows:

" 'To constitute duress by threats the actor's manifestation must be made for the purpose of coercing the other; must have for its object the securing of undue advantage with respect to the other; must be of such a character that it is adapted to overpower the will of the other and is reasonably adequate for the purpose; must in fact deprive the other of free exercise of will; and must cause the other to act to his detriment.' " *Hastain*, 205 Kan. at 482 (citing *Western Paving Co. v. Sifers*, 126 Kan. 460, 463-64, 268 P. 803 [1928]).

Our Supreme Court also instructs that "[w]hat constitutes duress or business compulsion must depend upon the circumstances of each particular case. [Citations omitted.]" *Evans v. Aylward*, 166 Kan. 306, 314, 201 P.2d 1044 (1949). Looking at the facts of *Comeau*, the action was "for breach of an employment contract." 869 F. Supp. at 860. The facts in *Hastain* and *Sifers* were more similar to the present case.

The plaintiff in *Hastain* brought an "action to recover on a promissory note. Defendants admitted execution of the note but sought to avoid it by alleging the execution was under duress." 205 Kan. at 475-76. The plaintiff in *Sifers* likewise brought an "action . . . to recover on a promissory note. The defense was that the note was given under duress." 126 Kan. at 460. Because we are duty bound to follow our Supreme Court precedent, we are unwilling to apply a different test than the one applied by our superior court to analogous facts. See *Buchanan v. Overley*, 39 Kan. App. 2d 171, 175-76, 178 P.3d 53, *rev. denied* 286 Kan. 1176 (2008).

Having determined the test, we will now consider the facts. Bank of America does not dispute with respect to the Second Modification and Extension Agreement that Orf made an actual threat, *i.e,* to foreclose. It does assert, however, that the trial court made no finding "of any wrongful act or improper threat with regard to

the Third or Fourth Modifications [and Extension Agreements]." The trial court made numerous findings of wrongful acts or improper threats, although many of them preceded the Third and Fourth Modification and Extension Agreements. We do not see a time limitation on the preceding acts or threats, however, especially since they laid the foundation for the coercive situation the Narulas found themselves in after they signed the Second Modification and Extension Agreement. Bank of America also ignores the trial court's finding of fraud with regard to its continuing promise to provide the Permanent Loan if the Narulas would liquidate their personal assets. Bank of America does not dispute this finding, and we believe it along with the rest of the trial court's findings were sufficient on the question of a wrongful act or improper threat.

Bank of America also contends that no evidence existed and that the trial court made no findings concerning the lack of free will. We disagree. Sanjiv Narula testified that Orf told him that he had to return the Second Modification and Extension Agreement the "next day." Moreover, Orf told him that "if you don't, then we're going to have to declare this in default."

With respect to the Narulas' free will in accepting the Third and Fourth Modification and Extension Agreements, Bank of America's expert, Michael Thomas Lewis, testified that he was "unaware of any other lenders who would take on the loan," that he was "not aware of any other alternatives" the Narulas had, and that they had "diminished bargaining power with [Bank of America] at that stage." Indeed, Sanjiv testified that he could not find another lender and that Bank of America placed "pressure" on him to liquidate personal assets.

We will now consider the Kansas test in light of the facts, beginning with the Second Modification and Extension Agreement. Orf threatened the Narulas with foreclosure if they refused to sign. We acknowledge that where "the only duress was the threat of plaintiff to institute foreclosure proceedings in the event the defendants failed to renew their past-due-paper," duress is not shown "in law." *Stout v. Judd*, 10 Kan. App. 579, 63 P. 662 (1900). But Kansas also considers the legitimacy of the threat. See *Campbell-Leonard Realtors v. El Matador Apartment Co.*, 220 Kan. 659, 665,

556 P.2d 459 (1976) (" 'It is not duress for one to threaten to take such legal proceedings *as the law affords* to recover damages for claimed injuries.' [Citation omitted.]" [Emphasis added.]); *Browning v. Blair*, 169 Kan. 139, Syl. ¶ 2, 218 P.2d 233 (1950) ("Ordinarily, it is not duress . . . to bring or threaten to bring an action to enforce *a valid obligation*, nor to do that which a party has *a legal right to do*." [Emphasis added.]). Orf's threat, "which required action at the moment to prevent ruin," was plainly illegitimate. *Evans v. Aylward*, 166 Kan. at 315.

In addition to breach of contract and fraud, Bank of America was breaching its fiduciary duty to the Narulas. As we will explain later, Bank of America had in fact assumed fiduciary duties, and this assumption may be considered in the duress analysis. See *Libel v. Libel*, 5 Kan. App. 2d 367, 368, 616 P.2d 306 (1980) (considering the existence of a "fiduciary relationship between the parties" when setting out the burden of proof for duress).

With respect to free will on the Second Modification and Extension Agreement, Bank of America argues:

"[T]o establish lack of free will, [the] Narulas would have to admit that they knew that the Second Modification [and Extension Agreement] deleted the [P]ermanent [L]oan provisions, but they signed it anyway to avoid the consequences of . . . Orf's alleged warnings. However, the [trial] court specifically found that [the] Narulas had no idea of the effect of deleting Section 2.2 of the Loan Agreement and that they thought they were merely signing another agreement just like the First Modification [and Extension Agreement]. According to the [trial] court's own findings and conclusions, no coercion was involved because [the] Narulas believed the Second Modification [and Extension Agreement] was giving them exactly what they wanted; they did not know they were giving up anything in return."

In our opinion the Narulas' ignorance, which Bank of America here accepts, tended to reduce their freedom. Not knowing what they were giving up, much less Orf's actual intent, the Narulas had no reason to assert their will against the execution of the Second Modification and Extension Agreement. Once they accepted Orf's representation that the extension followed the terms of the First Modification and Extension Agreement, in other words, their will was easily overborne. That was the intent in drafting the agreement, after all, to make it easier to persuade the Narulas to sign

the extension agreement. The trial court's findings supported its conclusion of law that the Second Modification and Extension Agreement was the product of economic duress.

The same legal reasoning applies to the Third and Fourth Modification and Extension Agreements. The Narulas still did not know Bank of America's true intentions. Bank of America does not dispute that it continued fraudulently to assure them of the Permanent Loan. The Narulas also had no other options for permanent financing, as Bank of America's own expert acknowledged.

On the other hand, Bank of America contends the following with respect to free will: "In exchange for the benefits [the] Narulas received under the Third and Fourth Modification [and Extension Agreements], they agreed to, among other things, changes in the interest rate and to release the claims they have asserted in this lawsuit." The putative benefit the Narulas received was an extension of the Construction Loan maturity date, but Bank of America should have converted the Construction Loan to the Permanent Loan months before. The fact that the Narulas accepted an increase in their interest payments while interest rates were actually falling shows a lack of free will, not its presence. The releases in the Third and Fourth Modification and Extension Agreements are precisely the issue here, and we agree with the trial court that they are unenforceable for duress under Kansas law.

Bank of America separately contends that the Narulas waived a remedy because they "treated these [A]greements as binding for a period of several months so as to obtain all the benefits flowing to them." Bank of America cites *Nichols Co. v. Meredith*, 192 Kan. 648, 652-53, 391 P.2d 136 (1964), and *Brown v. Wolberg*, 181 Kan. 919, 922-23, 317 P.2d 444 (1957), but these cases deal with the acceptance of contractual benefits after discovery of fraud or misrepresentation, not duress. The situations are distinguishable because a person under duress presumably knows it and, being under duress, can hardly be said to accept the benefits. Here, Bank of America's expert acknowledged that the Narulas lacked options, which did not constitute an acceptance of benefits.

Yet, if we applied the *Comeau* test with its additional element, "the absence of a reasonable alternative to entering the agree-

ment," this would change our ruling on the Second Modification and Extension Agreement. The federal court characterized the reasonable alternative element as "an objective form of the free-will" element. 869 F. Supp. at 865. Objectively, the Narulas could have done a number of things when Orf contacted them in Chicago. They could have delayed signing the extension until they had examined the agreement more closely; they could have compared it to the Loan Agreement upon returning home; they could have consulted counsel; or they could have refused to sign it, defending any of these choices or combination thereof by raising Bank of America's failure to convert the Construction Loan to the Permanent Loan. Nevertheless, our conclusion on this point would not change the result because we have separately held that the Second Modification and Extension Agreement was unenforceable for lack of consideration and fraud.

Moreover, the *Comeau* test would not change our ruling on the Third and Fourth Modification and Extension Agreements either. The trial court's findings establish that the Narulas lacked a reasonable alternative when they signed those agreements. Consequently, the result would remain the same under either legal standard.

### Breach of Contract

The trial court found that Bank of America's "failure to convert the Construction Loan to the Permanent Loan . . . constituted a breach of the Loan Agreement on December 31, 2001. Moreover, the . . . breach was material, in that the Permanent Loan was clearly an essential part of the Loan Agreement." Bank of America contends that it did not breach the Loan Agreement even "[a]ssuming the preconditions for conversion to the Permanent Loan . . . were satisfied." Thus, although breach is typically a question of fact, we are exercising unlimited review over the trial court's conclusion of law.

Bank of America suggests that "nothing was required . . . to effect that conversion [to the Permanent Loan]. No credit review was needed. No documents or promissory note needed to be signed. No funds needed to be advanced to pay off the Construc-

tion Loan. The conversion occurred automatically." The Narulas' response is a thought provoking question: "If the Permanent Loan was automatically made without any action by [Bank of America] . . . . on what basis could . . . Orf demand that the Narulas sign the Second Modification [and Extension Agreement] or else he would declare the loan to be in default?"

Obviously, Orf did not act as if the conversion had automatically occurred. He acted as if the Construction Loan was the sole source for payment of the $17,506 to the general contractor. That was the breach. He also cajoled the Narulas into signing the Second Modification and Extension Agreement, as we have previously discussed. But one could conclude further that the Second Modification and Extension Agreement, given its fraudulent nature, was an integral part of Bank of America's breach. Bank of America not only failed to make the conversion to the Permanent Loan, but also deceived the Narulas into relieving it of that obligation and waiving any claims for the previously mentioned breach. The trial court correctly found Bank of America committed a breach of contract. Indeed, a breach of contract is "a material failure of performance of a duty arising under or imposed by agreement." *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 374, 552 P.2d 885 (1976). Failure of Bank of America to convert the Construction Loan to the Permanent Loan, as required by the terms of the Loan Agreement, was a material breach of contract.

## Breach of the Covenant of Good Faith and Fair Dealing

The trial court also found that Bank of America "breached its implied covenant of good faith and fair dealing in several respects throughout this transaction." Bank of America contends, "[c]ontrary to the [trial] court's findings," that its "actions were intended to achieve a result that was in the best interest of both the [Narulas] and [Bank of America]—to reduce leverage and restructure the loan so that the [Narulas] could service their repayment obligations." "[W]hether the good faith standard was met is a question of fact. [Citation omitted.]" *St. Catherine Hospital of Garden City v. Rodriguez*, 25 Kan. App. 2d 763, 765, 971 P.2d 754 (1998).

In Kansas, "[t]he duty of good faith and fair dealing is implied in every contract, with the exception of employment-at-will contracts." *Estate of Draper v. Bank of America*, 288 Kan. 510, Syl. ¶ 13, 205 P.3d 698 (2009). The duty includes "not intentionally and purposely [to] do anything to prevent the other party from carrying out his part of the agreement, or [to] do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987) (quoting 17 Am. Jur. 2d, Contracts § 256, pp. 653-54).

The trial court found that Bank of America breached the duty as follows:

"(1) secretly attempting to remove the Permanent Loan obligation in the Loan Agreement even while the Narulas were fully current with all their loans; [2] hindering and delaying the fulfillment of the final precondition that [Bank of America] now claims in this action was necessary for the conversion to the Permanent Loan; *i.e.*, the final draw payment of $17,506 to the general contractor; (3) intentionally deceiving the Narulas to sign the Second Modification and Extension Agreement which contained an inconspicuous provision that attempted to delete the Permanent Loan from [the] Loan Agreement, even while [Bank of America] was fully aware that the Narulas desperately wanted the Permanent Loan; and (4) in failing to advise and inform the Narulas prior to their signing of the Second Modification and Extension Agreement that the [S]wap [A]greement was at least $100,000 'under water,' and that they would be personally liable for this early termination fee when the Permanent Loan was not made."

We conclude substantial competent evidence supported the first, third, and fourth of these findings. On the first, Bank of America does not directly dispute that it secretly attempted to remove the Permanent Loan obligation in the Loan Agreement even while the Narulas were fully current with all their loans. It instead asserts "there is no evidence of subjective dishonesty on . . . Orf's part." We do not believe "subjective" dishonesty was required, but we also disagree with Bank of America's view of the evidence.

Orf testified that he told Sanjiv Narula "several times" during negotiations over the Second Modification and Extension Agreement "that [the] requirement was going to be to delete the conversion feature." Orf said that he and Sanjiv "contested" the removal of the Permanent Loan provision, but that Sanjiv knew this

was a "condition" on the part of Bank of America. Orf maintained that "Sanjiv did not want the permanent feature stripped, deleted from the [L]oan [A]greement," but that Sanjiv [u]ltimately agreed to the removal of the Permanent Loan from the Loan Agreement. Orf claimed, "I would have never done that deal without [Sanjiv] knowing" about the removal.

In contrast to Orf's testimony, Sanjiv's testimony to the contested negotiations was very different. Sanjiv testified that Orf contacted him in January 2002 about doing "another extension . . . and my point was, I've done everything, why don't we just go to the permanent note, why do we have to do another extension. So we argued that a lot and I think it all revolved around . . . they had to do the extension in order to pay the 17,000. They couldn't really do the permanent note without going through that process." According to Sanjiv, Orf told him, "We can't make the [P]ermanent [L]oan right now. We've got to do the extension, get this cleaned up." Sanjiv testified that Orf "never told me" that Bank of America had decided not make the Permanent Loan. Sanjiv swore that if Orf had told him that, "I would have called an attorney." He also swore that he would not have signed the Second Modification and Extension Agreement if he "had known that that document deleted the [P]ermanent [L]oan." This conflict in the testimony would be sufficient to support a finding of subjective dishonesty on Orf's part.

There was also evidence to support the trial court's third finding, that Bank of America intentionally deceived the Narulas into signing the Second Modification and Extension Agreement, even while Bank of America was fully aware the Narulas desperately wanted the Permanent Loan. We have held previously that the provision in question was not conspicuous. But even if it was conspicuous, the undisputed manner in which Bank of America inserted the provision and Sanjiv's testimony regarding the communications from Orf established a lack of good faith and fair dealing.

With respect to the fourth finding, whether Bank of America failed to tell the Narulas before signing the Second Modification and Extension Agreement that the Swap Agreement was at least $100,000 "under water," Bank of America maintains on appeal that

the Narulas knew of the early termination fee. As we stated earlier, Orf could not recall at trial whether he told the Narulas the Swap Agreement was $100,000 underwater. Moreover, Orf's files contained no note showing that he had conveyed this information to the Narulas. In contrast to the bank's position, Sanjiv testified that he first learned about the swap termination fee when he sought out other lenders. When Sanjiv was asked, "Had you known that by signing the Second Modification [and Extension Agreement] and if the [P]ermanent [L]oan then was deleted and cancelled that you would have to pay a large termination fee, would you have signed the [document]," he answered, "I would not have signed it under either conditions [sic] deleting the permanent note, or if I had known that there was a penalty." The trial court's finding was again supported by the evidence.

We cannot necessarily agree with the trial court's second finding—that Bank of America hindered or delayed fulfillment of the final condition for payment of the $17,506 to the general contractor. To the degree this payment was conditioned on receipt of an unconditional release, Bank of America had reason for its action. With this one exception, the evidence supported the trial court's finding.

### Breach of Fiduciary Duty

The trial court acknowledged that the "relationship between a bank and its customers is ordinarily that of creditor-debtor and not of a fiduciary nature." Nevertheless, special circumstances may dictate otherwise. The trial court found "ample evidence that the Narulas have met their burden of proving that [Bank of America] had a fiduciary relationship with [them] both prior to this transaction and specifically with respect to the construction and financing of their new [b]uilding." The existence of a fiduciary relationship is a question of fact. *In re Estate of Farr*, 274 Kan. 51, 72, 49 P.2d 415 (2002); *Dugan v. First Nat'l Bank in Wichita*, 227 Kan. 201, 208, 606 P.2d 1009 (1980).

Bank of America does not dispute the trial court's underlying findings. Instead, the bank sets out other facts which "establish that there was no fiduciary relationship between [it] and [the] Na-

rulas." Once again, since we do not reweigh evidence or redetermine factual matters, we cannot decide what the evidence established. See *Hodges v. Johnson,* 288 Kan. 56, 65, 199 P.3d 1251 (2009). Our question is whether the trial court's findings supported its conclusions of law.

The trial court concluded that Bank of America had an implied, not a contractual, fiduciary duty to the Narulas. A fiduciary duty may be "implied in law due to the facts surrounding the involved transaction and the relationship of the parties to each other and to the transaction." *Linden Place v. Stanley Bank,* 38 Kan. App. 2d 504, Syl. ¶ 4, 167 P.3d 374 (2007). The question is whether a "special confidence is placed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one placing the confidence." 38 Kan. App. 2d 504, Syl. § 3. "One may not abandon all caution and responsibility for one's own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." 38 Kan. App. 2d 504, Syl. ¶ 5.

A special confidence exists under the facts of this case, creating a fiduciary duty on the part of Bank of America towards the Narulas. Beginning with its self-description as the Narulas' trusted financial advisor, Bank of America cultivated that trust in a wide range of financial dealings. *Cf. Jarvis v. Lieder,* 117 Conn. App. 129, 145, n.6, 978 A.2d 106 (2009) (characterizing a fiduciary as a "trusted financial advisor.") Bank of America then undertook to integrate the present loan with the Narulas' personal fortune. Bank of America's agents were integrally involved in advocating the construction of a building for Promotional Resources as a part of the Narulas' estate planning. The Narulas were encouraged and invited to place their trust and confidence in Bank of America's agents to guide them through the unfamiliar process. Moreover, the Narulas relied on the bank's agents that the swap interest rate product could meet the Narulas' requirement of a fixed interest rate on the Permanent Loan. As the record shows, what the Narulas actually received from signing the Swap Agreement was a one-way ticket to financial ruin.

When the Narulas agreed to sell some of their personal assets held in Bank of America accounts to cover part of the loan costs, based again on promises of a Permanent Loan, Bank of America's agents traded the assets. This last action clearly engaged fiduciary duties, albeit in the act of breaching them. See *Marcotte Realty & Auction, Inc. v. Schumacher*, 229 Kan. 252, Syl. ¶ 5, 624 P.2d 420 (1981) ("The real estate broker-seller relationship is a fiduciary one."); see also *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1481 (1989) ("[A] stock or commodities broker is the agent of the customer and a fiduciary relationship exists between them."); *O'Malley v. Boris*, 742 A.2d 845, 849 (Del. 1999) (The duties of a stock broker are "comparable to the fiduciary duties of corporate directors.").

These facts distinguish the present case from cases like *Dugan*, where the party claiming a fiduciary relationship was only a "long-time customer[] of the [b]ank." 227 Kan. at 207. "At no time" did the party in *Dugan* "seek the advice of any bank officer or employee, nor did she have any discussion with anyone at the [b]ank concerning the lease, the construction, the mortgages, or the subordination agreements" at issue in the litigation. 227 Kan. at 207-08. So there was "no evidence that the [b]ank served as [the party's] financial advisor." 227 Kan. at 208.

Imposing a fiduciary duty in a case like *Dugan* "would put an intolerable obligation upon banking institutions and convert ordinary day-to-day business transactions into fiduciary relationships where none was intended or anticipated." *Denison State Bank v. Madeira*, 230 Kan. 684, 696, 640 P.2d 1235 (1982). But in the present case "we are . . . faced with a situation where a party with superior knowledge used that knowledge to its own benefit to the detriment of the other party who occupied an inferior position without the knowledge, expertise, or ability to ascertain the true facts." 230 Kan. at 695. Bank of America contends that the Narulas should have retained counsel "or other appropriate professionals to advise them," but the question is whether Bank of America served in that role. The evidence supported the trial court's finding that it did.

As for breach, we have already identified one—the unauthorized trading of the Narulas' personal assets. The trial court pointed to others. Bank of America knew the Narulas' financial needs and vulnerabilities; yet, it orchestrated a secret strategy to remove the Permanent Loan provision that was embedded in the Loan Agreement. This action was taken although the Narulas were current on all loan payments. Bank of America then, "with the assistance of its counsel, intentionally deceived the Narulas into signing the Second Modification and Extension Agreement."

Moreover, one who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts. Bank of America failed to disclose material facts to the Narulas "for which [it] had superior knowledge: that their [S]wap [A]greement was at least $100,000 'under water.' " Such knowledge would have certainly thwarted Bank of America's plan to obtain the Narulas' signatures on the Second Modification and Extension Agreement because it was material to their future creditworthiness. It was no minor matter. Because, as the Narulas later learned, the swap termination fee would prevent them from obtaining financing from another lender to pay off their indebtedness to Bank of America. Consequently, Bank of America was under a duty to disclose this material information to the Narulas. See Restatement (Second) of Torts § 551(2)(a) (A duty to disclose arises when one party has information that the other party is entitled to know because of a fiduciary or similar relation of trust and confidence between them.).

In *Dugan*, our Supreme Court noted the absence of facts showing that the bank had breached any fiduciary duty: "The [b]ank made no false representations," it did not "induce" the party to enter into agreements at issue, and it "did not withhold any information which it should, in good conscience, have disclosed." 227 Kan. at 209. Bank of America did all these things. Hence, our ruling does not mean "a bank is precluded from taking any action, even if mandated by regulation, against a borrower," as Bank of America contends on appeal. Bank of America did far more than "reevaluate, reclassify and restructure loans based on a concern about the borrower's ability to service the debt," as it suggests. It positioned

itself as the Narulas' trusted financial advisor and took advantage of that relationship in an unfair and predatory way.

When Bank of America failed to convert the Construction Loan to the Permanent Loan, thus triggering the swap termination fee, it knew that the Narulas and their personal investment accounts had just boarded a ship to financial ruin. Without making the disclosure previously discussed, and before the Narulas' ship sank to a state of financial oblivion, Bank of America reduced its exposure to loans it had made to the Narulas by liquidating and by having the Narulas liquidate their personal investment accounts to pay off their corporate line of credit. The Narulas clearly placed their trust and confidence in Bank of America. The self dealing on the part of Bank of America and its failure to disclose crucial financial details to the Narulas was a breach of Bank of America's fiduciary duty.

## DAMAGES

### Compensatory Damages

Bank of America contests only a portion of the compensatory damages, "the amount of $386,603 for 'losses in investments.' " We review the trial court's findings supporting the award for substantial competent evidence. See *Kendrick v. Manda*, 38 Kan. App. 2d 864, 871, 174 P.3d 432 (2008); *Colorado Interstate Gas Co. v. Dufield*, 9 Kan. App. 2d 428, Syl. ¶ 8, 681 P.2d 25, *rev. denied* 235 Kan. 1041 (1984). The measure of damages itself is a question of law subject to unlimited review. See *Burgess v. Shampooch Pet Industries, Inc.*, 35 Kan. App. 2d 458, 460-61, 131 P.3d 1248 (2006).

The Narulas called Stanley H. House, CPA, as an expert witness on damages. House's testimony established the amount of the Narulas' "investment losses." The parties agree on appeal that the capital losses in question are the difference between the cost or other basis of investment assets owned or controlled by the Narulas and the price at which they were sold by Bank of America in 2002.

Bank of America first argues that its "disposition of the pledged investments was commercially reasonable, as a matter of law." It cites K.S.A. 2010 Supp. 84-9-627(b), which controls how "disposition of collateral" may occur "in a commercially reasonable man-

ner." Bank of America claims a "right to liquidate the pledged accounts to satisfy indebtedness then due and payable."

The trial court did not award damages because Bank of America sold the assets in a commercially unreasonable manner. It awarded damages because Bank of America arrived at the point of selling the assets by breaching the Loan Agreement, breaching its duty of good faith and fair dealing, breaching its fiduciary duty, and also committing fraud, negligent misrepresentation, and duress while obtaining releases for these actions. House agreed at trial that Bank of America's actions "caused" the sales for loss, and he also agreed that compensation in the amount of the losses was "appropriate . . . for inclusion in the damages." Bank of America did not object to this testimony.

Judging from the record, Bank of America also did not argue below, as it argues on appeal, that the measure of damages should be "the difference between: (1) the price realized upon liquidation and (2) the highest market price between (a) the time [the] Narulas had notice of the liquidation and (b) a reasonable time thereafter for [the] Narulas to decide whether to go into the market to replace the liquidated investments." We will not consider this issue for the first time on appeal. It is not properly before us because we have no trial court ruling to consider. See *In re Care & Treatment of Miller*, 289 Kan. 218, 224-25, 210 P.3d 625 (2009). The record is also inadequate to apply the test Bank of America suggests. See *Kelly v. VinZant*, 287 Kan. 509, 526, 197 P.3d 803 (2008). Bank of America's argument, furthermore, does not address the underlying need for liquidation caused by its own misdeeds.

Bank of America makes one more point in passing. It suggests that the Narulas and Promotional Resources failed to prove "that any proceeds resulting from the liquidation of their non-pledged accounts were paid to" Bank of America. We decline to consider this for the reasons just stated, plus the rule that a point raised incidentally but not argued is deemed waived or abandoned on appeal. See *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008).

## Punitive Damages

Bank of America contends that the trial court erred in finding it liable for punitive damages. Punitive damages are governed by K.S.A. 60-3701 *et seq.*, and our review of statutory interpretation is unlimited. See *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009) (statutory interpretation). We "must find that the substantial evidence supporting the punitive damages finding is clear and convincing." *York v. InTrust Bank, N.A.*, 265 Kan. 271, Syl. ¶ 18, 962 P.2d 405 (1998).

Bank of America first contends that the award was procedurally barred. It acknowledges that the Narulas and Promotional Resources properly moved to amend their counterclaims to allow punitive damages, that the trial court held a hearing on the motion, and that it then granted the motion, all before the agreed Pretrial Order was filed. Bank of America observes, however, that no "amended counterclaim seeking an award of punitive damages" was ever filed. It also observes that the agreed Pretrial Order did not set out the punitive damages counterclaim.

Bank of America does not contend, at least in its initial brief, that it was unfairly surprised at trial or otherwise prejudiced by this procedure. In its reply brief, Bank of America states that it did not "acquiesce[] to the inclusion of punitive damages in the trial," but this is still not a claim of prejudice. And below, Bank of America did not file a written objection to the trial court's consideration of punitive damages until nearly 6 months after trial and a week after the posttrial hearing on the amount of punitive damages. In this motion, Bank of America raised only the procedural issues mentioned on appeal, not any actual prejudice.

We cannot find reversible error on these facts. Because the motion to amend was filed before the final pretrial conference in accordance with K.S.A. 60-3703, the trial court could consider and reconsider it at a later time. See *Burrowwood Assocs., Inc. v. Safelite Glass Corp.*, 18 Kan. App. 2d 396, Syl. ¶ 1, 853 P.2d 1175 (1993). The rule on pretrial orders is similar—they govern unless modified "by agreement of the parties, or by the court to prevent manifest injustice," K.S.A. 60-216(e), and the trial court may mod-

ify in its "sound discretion." *Hibbert v. Ransdell*, 29 Kan. App. 2d 328, Syl. ¶ 6, 26 P.3d 721, *rev. denied* 272 Kan. 1418 (2001).

Here, the motion to amend was properly filed, and the trial court considered the issue at trial. Whether the trial court's consideration is seen as a late ruling on the motion to amend or as a modification of the agreed pretrial order, it was acting within its discretion. If the trial court's action prejudiced Bank of America in some way, it was required to make a record demonstrating that prejudice and then argue the point on appeal. See *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 395, 204 P.3d 562 (2009); *Kelly*, 287 Kan. at 526.

As for the failure to file amended counterclaims, the trial court's journal entry of December 20, 2007, "hereby amended" the counterclaims "to include a claim for punitive damages." We agree this procedure was not in keeping with K.S.A. 60-3703, which contemplates an order "allowing an amended pleading that includes a claim for punitive damages to be filed." But the deviation was technical and may be disregarded on appeal. See K.S.A. 60-261; K.S.A. 60-2105.

Bank of America argues substantively that the Second Modification and Extension Agreement "expressly states that the Permanent Loan provisions will be deleted," and that "nothing in the record supports the [trial] court's holding that . . . Orf's failure to tell [the] Narulas that the Swap Agreement was underwater was either malicious, willful, or wanton." Nevertheless, Bank of America ignores "fraud" as a basis for punitive damages, which is listed along with malicious, willful, or wanton action under K.S.A. 60-3702(c). The trial court in the present case found all four bases.

We have already discussed Orf's fraud, accomplished with the assistance of counsel, in preparing and obtaining the Narulas' signatures on the Second Modification and Extension Agreement. This was the partial basis for the trial court's punitive damages finding, and we hold it was supported by substantial evidence. Moreover, Orf's failure to disclose to the Narulas that they were $100,000 underwater on the Swap Agreement, the other basis for the trial court's ruling, was fraudulent as well.

We find that Orf's failure to disclose to the Narulas the information about the Swap Agreement was also wanton. "[W]anton conduct . . . is defined as the reckless disregard for the rights of others with a total indifference to the consequences. [Citation omitted.]" *Danisco Ingredients USA, Inc. v. Kansas City Power & Light Co.*, 267 Kan. 760, 772, 986 P.2d 377 (1999). Orf showed a reckless disregard for the Narulas' rights when he "engaged in a secret strategy to try to remove its obligation to make the Permanent Loan that was embedded in the Loan Agreement," all the while remaining silent regarding the Swap Agreement. Orf was totally indifferent to the consequences of keeping this "important information," as determined by the trial court, from the Narulas before they signed the Second Modification and Extension Agreement. It prevented the Narulas from obtaining financing elsewhere and allowed Bank of America to increase its demands even while in breach of its duties. The record contains clear and convincing evidence that Bank of America "acted toward[s]" the Narulas and Promotional Resources "with willful conduct, wanton conduct, fraud or malice." K.S.A. 60-3702.

Bank of America finally maintains "[t]here is no evidence" that "anyone" knew of Orf's actions for purposes of authorization or ratification under K.S.A. 60-3702(d)(1). Orf testified that all of his actions shown on reports were approved by his supervisor. Moreover, he testified that he "did not have singular authority to do anything." In one report from the end of January 2002, Orf stated that the "provision for the conversion of the note from a construction note to permanent financing was deleted to provide more flexibility in negotiating a restructure." Orf stated that this was done although "[c]onstruction was essentially complete." Orf's supervisor signed the report. As already established, Orf also worked with Bank of America's counsel on the Second Modification and Extension Agreement. Bank of America then continued on the same course after Orf left its employment in October 2002. Taking this evidence together with the rest of the record, there was sufficient proof that Bank of America engaged in "a course of conduct indicating the approval, sanctioning, or confirmation of the ques-

tioned conduct." *Smith v. Printup*, 254 Kan. 315, 342, 866 P.2d 985 (1993).

Affirmed.